Louis MATIRE, Petitioner-Appellant,

v.

Louie WAINWRIGHT,
Respondent-Appellee.

No. 84–5705.

United States Court of Appeals,
Eleventh Circuit.

March 9, 1987.

Louis Matire, pro se.

John E. Bergendahl, Asst. Federal Public Defender, Miami, Fla., for petitioner-appellant.

Penny H. Brill, Diane Leeds, Asst. Attys. Gen., West Palm Beach, Fla., for respondent-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

ANDERSON, Circuit Judge:

Matire appeals the district court's denial of his petition for writ of habeas corpus with regard to his claim of ineffective assistance of appellate counsel on his direct appeal. Matire is currently in the custody of Louie L. Wainwright, Secretary of the Florida Department of Corrections. Matire was found guilty of first degree murder and sentenced to life imprisonment in 1968.

## I. BACKGROUND

In 1967, Matire was romantically involved with and sometimes lived with Dianne Benhardt, who was separated from her husband Robert Benhardt. In mid-May, 1967, Dianne indicated to Matire that her son was moving to Florida from New Jersey, where he was living with her husband, to live with her and that Matire would no longer be able to live with her. It also appears that Dianne attempted to terminate her relationship with Matire at about that time.[1] During the course of these discussions, Matire became very upset and threatened to go to New Jersey and "kill the whole family." He claimed to have broken Dianne's television and record player and slashed many of her clothes with a knife. Matire also threatened suicide if things didn't work out between him and Dianne.

On May 27, 1967, Robert Benhardt arrived unexpectedly in Ft. Lauderdale to attempt to reconcile with his wife. The following evening he went to the Bahia Cabana where Dianne was working as a cocktail waitress. Matire subsequently arrived at the bar. After apparently overhearing a remark which identified Robert Benhardt as Dianne's husband, Matire began talking with him. The two men engaged in conversation with no show of animosity or altercation. At this time Dianne indicated to Matire her intent to reconcile with her husband. Without any evidence of animosity toward Dianne's husband, Matire left the bar at approximately 11:30 p.m. and went to his brother's home to obtain his brother's .22 caliber pistol. Matire told his brother that he intended to kill himself with the gun.

Matire returned to the Bahia Cabana with the gun which he testified was concealed inside his shirt. None of the witnesses who testified at the trial could say that Matire had a gun in sight when he re-entered the bar. Two witnesses testified that on Matire's return to the bar Robert Benhardt said something to Matire such as "no, you don't," "what are you doing," or "don't be silly." Gallagher, called as a witness by the state, testified that he heard Benhardt say something like "What the hell are you doing," that Robert Benhardt swung off his barstool and came toward Matire, that Benhardt shoved Matire backwards, and that a struggle ensued over the gun. No other witness contradicted this version of the events. In the course of the struggle both Matire and Robert Benhardt received gunshot wounds. After Benhardt slumped to the floor, Matire, as he fled the scene, waved the gun and threatened those in the bar not to move.

---

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Although Dianne testified that she terminated the relationship, she also testified that she and Matire continued to see each other afterwards and up until the arrival of her husband.

Benhardt died as a result of the wounds he received.

Matire was arrested shortly after the shooting and taken to the hospital. He was informed of his rights at the time of the arrest and declined to make a statement. He was informed of his rights again at the hospital and again declined to make a statement. However, while at the hospital Matire made incriminating statements to his mother within the hearing of police officers. Specifically, Matire's statement to his mother was reported by the officer who was guarding him as:

> [Matire and his mother] had trusted [Dianne] and she had told him that she loved him. Now that this happened he wanted to die....
>
> [Matire's mother] told him that he had done wrong by shooting Benhardt ... and he stated that he didn't care, and if he didn't die tonight he would shoot him again and make sure that he was dead ... he would shoot him again if he had the chance.... He then babbled on how he did not care what happened to him.

Tr. 578–79.

At the trial, the prosecutor asked the arresting officer whether he had informed Matire of his rights and whether Matire had made a statement. The arresting officer responded that he had informed Matire of his rights and that Matire had not made a statement. The full text of this first comment on Matire's post-arrest silence is set forth as follows:

> PROSECUTOR: What rights did you advise the defendant of?
>
> ARRESTING OFFICER: I told him he was under arrest for aggravated assault and he had the right to remain silent.
>
> PROSECUTOR: Did he respond to your question?
>
> ARRESTING OFFICER: Yes, sir.
>
> PROSECUTOR: Did you say anything further to him as regards his rights?
>
> ARRESTING OFFICER: Yes, sir, I said he had the right to an attorney and I asked if he understood that.
>
> PROSECUTOR: All right.

> ARRESTING OFFICER: He said before any questions would be asked him that he could have an attorney present. I asked if he understood that. I said, "Any time he was answering questions if he wanted to stop, he had the right to stop. Did he understand that?" And he said he did.
>
> PROSECUTOR: Did you ask him if he couldn't afford a lawyer that the State would get him one?
>
> ARRESTING OFFICER: I told him that the State would provide an attorney for him if he could not afford one.
>
> PROSECUTOR: All right. Now, did he respond to each one of your statements?
>
> ARRESTING OFFICER: Yes, sir.
>
> PROSECUTOR: Now, after your telling him this, did he make a statement to you?
>
> ARRESTING OFFICER: No, sir, he said nothing.

Tr. 537–38. Matire's counsel moved for a mistrial on the basis of this first comment on his post-arrest silence. The trial court summarily denied the motion.

A police officer testifying later made a second comment on Matire's post-arrest silence. The officer stated that at the hospital he had advised Matire of his rights and that Matire replied he did not wish to make a statement. The officer also reported the incriminating statements described above which he overheard Matire make to his mother. Matire's defense counsel did not object to the admission of these statements.

Matire presented an insanity defense. In closing argument the prosecutor made further comment on Matire's post-arrest silence by two explicit references to Matire's refusal to make a statement in the context of rebutting the insanity defense. In full, the third comment was:

> The very first thing that happened to that man [after his arrest], the very first thing after that, they warned him of his civil rights that he may have, and asked if he wanted to say anything, and he said no.

From there—they knew he was wounded—they took him over to the hospital to be treated. As an added precaution, as soon as he came into the hospital in the emergency ward, you heard Officer McLellan. He testified that he was brought in and Sergeant Bruce Lieberman gave him—again told him what his civil rights were, told him he didn't have to say anything; and he also testified that the man was rattling. He babbled on, or he was emotionally upset.

Of course, he was emotionally upset. There is no question in the world. We wouldn't say that he wasn't emotionally upset. He killed a man. I am sure the stark realization of what he had done was fully upon him.

The medical testimony that you heard was that he was just—all of it—the sheer enormity of the whole thing was upon it. In fact, even after he said he didn't want to make a statement, he had to talk. He had to say something. He talked to his mother.

He said, "What kind of a girl is that, Mother, that would do that thing to me," and he went on.

He said, "I don't want to live myself, but if he isn't dead, I will do it—I will shoot him again."

This is a man who is upset fully, but cognizant of what he did, fully cognizant of what he did. He knew he shot somebody.

Tr. 809–10. The jury convicted Matire of first-degree murder and recommended mercy. The trial court sentenced Matire to life imprisonment.

On direct appeal, Matire's appellate counsel raised one issue, trial court error in failing to submit a written set of instructions to the jury. Matire's conviction and sentence were affirmed. Matire brought three separate collateral attacks on his conviction in state court. The first of these raised the competency to stand trial issue. The Florida Appellate Court summarily affirmed Matire's conviction and sentence

without opinion. 375 So.2d 920 (Fla.App. 4th 1979). The second collateral attack raised the Fifth Amendment issue. In his brief, Matire's counsel discussed only the first comment on Matire's post-arrest silence. The Fifth Amendment issue was dismissed because Matire had not raised it on direct appeal. The Florida Appellate Court affirmed the dismissal with the proviso that the dismissal was "without prejudice, however, to appellant filing a petition for habeas corpus ... based upon an allegation of ineffective assistance of appellate counsel." 403 So.2d 1049, 1050 (Fla.App. 4th 1981). Matire subsequently filed a third petition for post-conviction relief based on ineffective assistance of appellate counsel as to the Fifth Amendment issue. While the first comment was clearly relied upon, it is unclear from the record whether either Matire or the state court relied upon the second and third comments as instances of ineffective assistance as well. This petition was considered on its merits and denied without opinion by the Florida courts.

After all these appeals were denied, Matire filed the instant petition for writ of habeas corpus in federal court, alleging that his conviction was obtained by a violation of his Fifth Amendment right against self-incrimination and that he was denied his Sixth Amendment right to effective assistance of appellate counsel because of appellate counsel's failure to raise the Fifth Amendment issue. In both prongs of the Fifth Amendment argument, Matire's counsel expressly addressed only the first comment on Matire's post-arrest silence. The district court denied the petition on the basis that the Fifth Amendment error underlying the ineffective assistance of counsel claim was harmless and rejected the independent Fifth Amendment claim on the basis that it was harmless and procedurally barred.

## II. ISSUE

■ The only issue [2] presented on appeal which we find necessary to address at

---

**2.** Matire also claims that appellate counsel was ineffective for failure to challenge the sufficien-

length is ineffective assistance of appellate counsel for failure to challenge on direct appeal the alleged improper comments on Matire's exercise of his Fifth Amendment right to remain silent.

## III. DISCUSSION

Matire asserts that his counsel on his direct appeal was ineffective for failing to raise on appeal three improper comments on Matire's exercise of his Fifth Amendment right to remain silent: the first comment by the first testifying officer, the second comment by the second testifying officer, and the prosecutor's comment in closing argument.

■ Before addressing the merits of this claim, we must evaluate the state's argument that we should not consider the second and third comments because they were not expressly raised in the district court. Although we acknowledge the general rule against consideration of issues not raised in the district court, we conclude that the second and third comments were fairly presented to the district court. Although in his habeas corpus petition in district court Matire did not specifically rely on the second comment by the officer and the prosecutor's comment in closing argument, he challenged the effectiveness of his appellate counsel and expressly relied on the failure of the appellate counsel to challenge

the officer's first comment in violation of Matire's Fifth Amendment rights. To review the ineffective assistance claim, the court had to examine the total performance of appellate counsel and the effect thereof, and thus would necessarily have considered the related comments, including the prosecutor's argument to the jury which itself was based on the evidence specifically challenged. To hold otherwise would require us to assume that the district court ignored its duty to assess counsel's total performance; it would require us to assume that the district court ignored its duty to evaluate any deficiencies in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different. *See Francis v. Spraggins,* 720 F.2d 1190, 1192–93 (11th Cir.1983) (holding in an analogous context that when habeas petitioner presented to the state courts an ineffective assistance of counsel claim based on several deficiencies he was not procedurally barred in federal court from basing that claim additionally on counsel's closing argument; holding that the related closing argument was fairly presented to the state courts), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985). Thus, we conclude that the ineffective assistance of counsel claim which Matire presents on appeal was fairly presented to the district court.[3]

cy of the evidence. We conclude that appellate counsel was not ineffective for failing to raise this ground. As we conclude below in the course of our discussion in this opinion, there was strong, though not overwhelming, evidence of a premeditated killing, and while the weight of the evidence favored Matire on the insanity issue, there was clearly sufficient evidence to support the jury verdict. Thus, we conclude that there was sufficient evidence, and that appellate counsel's failure to raise the issue is not a Sixth Amendment violation.

In light of our disposition of the issue discussed at length in this opinion, we need not address Matire's only other claim on appeal, i.e., that his appellate counsel was ineffective also because of his failure to raise on direct appeal the failure of the trial court to conduct a hearing on Matire's competence to stand trial.

**3.** The state has not argued on appeal that reliance on the second and third comments would

be procedurally barred under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The state does not assert a *Sykes* bar probably because the state court also evaluated counsel's total performance on the record as a whole, because *Francis v. Spraggins, supra,* would in any event require a conclusion that there is no such bar in this case, and finally because the facts of this case do not constitute a procedural default under Florida law. In *Greenfield v. State,* 337 So.2d 1021, 1022–23 (Fla.App.1976), an improper comment on Greenfield's silence was made by the testifying officer, but there was no objection. However, there was objection when the prosecutor later argued the evidence in closing. The Florida court considered not only the improper argument, but also the admissibility of the evidence. *Greenfield* suggests that Florida recognizes that the proper evaluation of such comments necessarily encompasses related comments. *Greenfield* suggests that the facts of this case probably

■ To make a successful claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Id.* at 688, 104 S.Ct. at 2065. Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The standard for ineffective assistance is the same for trial and appellate counsel. *Peoples v. Bowen,* 791 F.2d 861 (11th Cir.), *cert. denied* —— U.S. ——, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).

To assess the deficiency of counsel, we must evaluate the asserted basis of counsel's deficiency, i.e., the failure of appellate counsel to raise the allegedly improper comments on silence. We must determine whether the comments were error, and if so how patent.

■ The testimony by the two officers regarding Matire's post-arrest silence which the prosecutor elicted and the prosecutor's closing argument are impermissible comments on Matire's post-arrest silence. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that direct comments by the prosecution on a defendant's silence in a state criminal proceeding violate the Fifth Amendment. In this circuit, the definition of such an impermissible comment turns on whether the remark is "manifestly intended" by the prosecutor or "would naturally and necessarily be understood by the

jury" as a comment on the defendant's silence. *United States v. Vera,* 701 F.2d 1349 (11th Cir.1983). In addition, the reviewing court is to consider the overall trial context of the comment. *United States v. Forrest,* 620 F.2d 446, 455–56 (5th Cir. 1980).[4] Here, all of the standards of an impermissible comment are met. The comments were direct and would naturally be understood by a jury as comments on silence. When viewed in the context of the overall proceedings, the comments show a manifest intent on the part of the prosecutor to highlight the defendant's silence and to utilize it to defeat his insanity defense. There were repeated questions. The prosecutor was not just seeking to verify that Matire was advised of his rights, with the officer simply volunteering that Matire had remained silent. Rather after ascertaining that the *Miranda* advice was given, the prosecutor on three separate occasions expressly asked the first testifying officer whether Matire had responded, including an express question: "did he make a statement to you?" Tr. 538. After the issue had been expressly raised by defense counsel's motion for mistrial, the prosecutor repeated the same procedure with the second testifying officer. After ascertaining that Matire had been advised of his *Miranda* rights, the prosecutor again asked if Matire had responded. The officer answered that Matire had "replied he did not want to make a statement." Finally, in his closing argument, the prosecutor himself commented on Matire's silence, and linked Matire's desire to remain silent to his insanity defense, arguing that he understood what he was doing. In this regard, the prosecutor's comment is indistinguishable from that condemned in *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

do not establish a procedural default under state law. To the same effect, *see Greenfield v. Wainwright,* 741 F.2d at 331 n. 1 and 332 n. 3; *see also Greenfield v. Wainwright,* 474 U.S. at ——, 106 S.Ct. at 637 (describing *Clark v. State,* 363 So.2d 331 (Fla.1978) as holding that an improper comment on silence was reviewable on appeal if objection was made either at the time the

evidence was introduced or at the time of the prosecutor's comment).

4. This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

■ While this use of Matire's silence clearly violated the due process clause of the Fourteenth Amendment, *see Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), such a constitutional violation is subject to the harmless error rule. *United States v. Meneses-Davila,* 580 F.2d 888 (5th Cir.1978). *Meneses-Davila* identified three categories into which prosecutorial comment on a defendant's silence may fall:

(1) When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.

(2) When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

(3) When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

*United States v. Meneses-Davila,* 580 F.2d 888, 893 (5th Cir.1978) (citing *Chapman v. United States,* 547 F.2d 1240, 1249–50 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977)).

However, *Meneses-Davila* recognized that comments on post-arrest silence do not always fit neatly into these three categories and that determinations of harmlessness must be made on a "case-by-case ba-

sis," *id.* at 890. The procedure for making such a determination should include:

an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt.

*Id.* In *Meneses-Davila,* the court emphasized the fact that there was more than a single reference to the defendant's silence. *Id.* at 895. Further, the court found that "while the evidence of defendant's guilt was strong, it was not 'overwhelming,' nor was defendant's exculpatory story 'transparently frivolous.'" *Id.*

We find that Matire's situation closely resembles that in *Meneses-Davila.* At three different times during Matire's trial, reference was made to the fact that Matire wished to remain silent, including the prosecutor's closing argument linking Matire's silence to the insanity issue. Significantly, insanity was the thrust of his defense, and the evidence of Matire's sanity at the time of the shooting was far from overwhelming.

The evidence established that Matire's mental problems began at an early age. At the time Matire was three weeks old, he had brain surgery. He suffered nightmares and nervous problems throughout his childhood. After his first suicide attempt when he was fourteen years old, he was diagnosed by a psychiatrist as schizophrenic. At seventeen he joined the Navy but received a medical discharge due to psychiatric problems. Following his discharge from the Navy, Matire attempted suicide several times prior to this incident. Two of these past suicide attempts led to his temporary commitment to the psychiatric units of Bellevue Hospital in New York and Darcy Hospital in Florida. While at Darcy Hospital, Matire was under the care of Dr. Williams, who testified at Matire's trial. Dr. Williams testified that two years prior to the shooting he had diagnosed Matire as a paranoid schizophrenic and had advised his mother to have him permanently institutionalized because Dr. Williams believed Matire's psychiatric problems so

severe as to make Matire dangerous. In addition to Dr. Williams' testimony that Matire did not know right from wrong at the time of the shooting, the defense called a psychologist and two other psychiatrists to testify as to Matire's mental state at the time of the shooting. All of these experts diagnosed Matire as a schizophrenic. The two psychiatrists, Doctors McIntyre and Lever, testified that they had concluded on the basis of their examinations of Matire that at the time of the shooting Matire had gone into a kind of panic reaction in which he did not know what he was doing.

■ The state called two psychiatric experts who based their testimony on a single post-arrest examination of Matire, as compared to Dr. Williams' diagnosis in the course of his medical treatment, two years before the incident. These witnesses concluded that although Matire suffered from some mental disturbances, he did not meet the legal definition of insanity because he did know right from wrong at the time of the shooting. One of these witnesses did concede, however, that at the time of the shooting Matire could have been suffering from a panic reaction in which he did not know right from wrong. We think that it is manifest that the evidence of sanity was far from overwhelming. We conclude that the improper comment on Matire's silence cannot be deemed harmless beyond a reasonable doubt.[5] *See Greenfield v. Wainwright*, 741 F.2d 329, 336 (11th Cir.1984) (holding that prosecutor's comment on silence as evidence of sanity was not harmless), *aff'd on other grounds*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

Having concluded that the improper comment on Matire's right to remain silent did violate Matire's Fifth Amendment rights and was not harmless, we return to our Sixth Amendment inquiry, i.e., was Matire's counsel on direct appeal constitutionally deficient in failing to raise the issue,

---

**5.** The state argues, and the court below found, that the improper comment was harmless because there was overwhelming evidence of premeditated murder, primarily in the form of Matire's statement to his mother that he would do it again. We reject this argument for two reasons. First, it does not take into account the effect of the improper comment on the insanity defense with respect to which the evidence was far from overwhelming. *See* discussion in text. Second, we disagree with the conclusion that there was overwhelming evidence of premeditation. It is true that Matire's statement to his mother that he would do it again is strong evidence of premeditation. However, that statement was made immediately after the events, while Matire was in the hospital as a result of his own gunshot wounds, and at a time when uncontradicted evidence establishes that Matire was severely distraught. Even if a person had accidentally or impulsively killed a rival for his lover's affections, he might well after the fact be glad the rival was dead, especially during a state of emotional trauma. We note that this statement to his mother was immediately preceded by Matire's statement to his mother that now that this had happened he wanted to die. More significantly, while Matire's statement to his mother must be acknowledged to be strong evidence of premeditation, there was also strong evidence that the fatal shooting was either accidental or impulsive. A strong inference from Gallagher's testimony is that Benhardt initiated the physical struggle, since Gallagher testified that Benhardt swung off the barstool and shoved Matire backward. Gallagher was the only witness who testified with respect to the details of the commencement of the struggle, and his testimony provided some corroboration for Matire's testimony that he came back to the bar intending to commit suicide in front of Dianne, that he had the gun under his shirt as he walked in, that Benhardt started the fight, coming off the barstool and punching Matire in the stomach. This version of the facts is also consistent with the fact that none of the witnesses could testify that they saw a gun in Matire's possession when he re-entered the bar, and with the fact that both men were shot during the struggle. Of course, there were inferences to the contrary. In addition to Matire's statement to his mother that he would do it again, additional inferences of premeditation include: the fact that he left and returned with a gun (the jury might disbelieve the testimony of Matire and his brother that Matire had the gun to commit suicide, notwithstanding the strong evidence of prior suicide attempts in similar circumstances); the inference that Matire provoked the struggle might arise from the testimony that immediately before the struggle Benhardt said something like "what are you doing"; and the manner in which Matire fled the scene. The medical testimony also introduced the suggestion that, even if Matire had provoked or initiated the struggle, the actual shooting might have been impulsive rather than premeditated. After a careful review of the record, we are satisfied that the evidence of premeditation was not overwhelming.

and did that deficiency actually prejudice Matire.

■ We conclude that counsel's failure to raise the Fifth Amendment issue causes his performance to fall below that wide range of competence required of attorneys in criminal cases. The improper comment was obvious on the record, and must have leaped out upon even a casual reading of transcript. The first improper comment was expressly objected to in trial counsel's motion for mistrial. Moreover, the fact that such comments were in violation of the Fifth Amendment was widely known at the time, and was embodied in two Florida statutes, Fla.Stat. § 918.09 (1967), *repealed* 1970 Fla.Laws c. 70–339, § 180, and Fla. Stat.Ann. Rule 3.250 (West 1973) (Florida Rule of Criminal Procedure).[6] We find no merit in the state's argument that appellate counsel might have deemed the Fifth Amendment violation harmless, thus excus-

ing his failure to raise the issue. First, at the time appellate counsel's brief on direct appeal was filed, November 1968, the law of Florida clearly provided that such an error was reversible without regard to harmless error doctrine.[7] Second, as indicated in the discussion above, the Fifth Amendment violation was not harmless. Our conclusion that counsel's performance was substandard is bolstered by the fact that appellate counsel's brief on direct appeal raised only a single, weak issue, notwithstanding the fact that a substantial, meritorious Fifth Amendment issue was obvious upon even a casual reading of the trial transcript. The weak issue actually raised challenged the failure of the trial judge to send written jury instructions out with the jury. We cannot conclude that the "adversarial testing process" worked in Matire's direct appeal. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

**6.** The text of each of the statutes was identical, and read:

In all criminal prosecutions the accused may at his option be sworn as a witness in his own behalf, and shall in such case be subject to examination as other witnesses, but no accused person shall be compelled to give testimony against himself, nor shall any prosecuting attorney be permitted before the jury or court to comment on the failure of the accused to testify in his own behalf, and a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury.

Both of these statutes which strictly prohibited any prosecutorial comment on a defendant's silence were in existence, in substantially similar form with regard to prosecutorial comment on a defendant's right to remain silent, since 1895. *See, e.g.,* 1895 Fla.Laws ch. 4400, §§ 1 and 2908, which read,

In all criminal prosecutions the accused may at his option be sworn as a witness in his own behalf, and shall in such case be subject to examination as other witnesses, but no accused person shall be compelled to give testimony against himself, *nor shall any prosecuting attorney be permitted before the court or jury to comment on the failure of the accused to testify* in his own behalf.

*See also, e.g.,* 1939 Fla.Laws ch. 19554, § 214.

Litigation under these statutes was common long before the landmark United States Supreme Court case of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See e.g., Jackson v. State,* 45 Fla. 38, 34 So. 243

(1903); *Dabney v. State,* 119 Fla. 341, 161 So. 380 (1935); *Gordon v. State,* 104 So.2d 524 (Fla.1958); *McLendon v. State,* 105 So.2d 513 (Fla.App.1958) (prosecutorial comment on failure of defendant to make a statement to deputy sheriff impermissible); *Milton v. State,* 127 So.2d 460 (Fla.App.1961); *Tolliver v. State,* 133 So.2d 565 (Fla.App.1961), *cert. denied,* 139 So.2d 691 (Fla.1962).

**7.** On the relevant date, the only decisions in Florida on the subject had clearly held that harmless error did not apply to comments on a defendant's silence. *McLendon v. State,* 105 So.2d 513 (Fla.App.1958); *Trafficante v. State,* 92 So.2d 811 (Fla.1957); *Way v. State,* 67 So.2d 321 (Fla.1953). The state asserts that this doctrine was put in doubt by *State v. Galasso,* 217 So.2d 326 (Fla.1968), a doubt which was later resolved by *Bennett v. State,* 316 So.2d 41 (Fla. 1975). *Bennett* held that the harmless error doctrine does not apply to comments on silence. This ruling remained in effect until *State v. Marshall,* 476 So.2d 150 (Fla.1985) and *State v. DiGuilio,* 491 So.2d 1129 (Fla.1986) (adopting the federal harmless error standard enunciated in *Chapman* ).

However, even if *Galasso* did throw the harmless error rule in doubt for the 1968–1975 period, it is irrelevant to our concerns because the decision in *Galasso* was released on Dec. 20, 1968, a month after Matire's direct appellate counsel filed his brief in Matire's direct appeal, and thus could not have affected counsel's judgment as to Matire's possible claims.

We also conclude that counsel's deficient performance worked to Matire's actual prejudice. Had appellate counsel raised the Fifth Amendment issue, there was more than a reasonable probability that the outcome of the appeal would have been different.[8] In light of the then Florida rules of per se reversal, there was a near certainty that Matire's conviction would have been reversed. Even in the absence of the Florida per se reversal rule, we conclude, for the reasons set out in the discussion above, that there is a reasonable probability that the result on direct appeal would have been different because the error was not harmless.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Matire received ineffective assistance of counsel on direct appeal in violation of the Sixth Amendment. The judgment of the district court is reversed, and remanded with instructions that a writ of habeas corpus be issued conditioned upon Florida affording Matire a new direct appeal.

REVERSED and REMANDED.

---

**8.** Cases in other circuits have held that when the effectiveness of appellate counsel is challenged, the proper focus of the prejudice inquiry is the outcome of the appeal. *Lockhart v. McCotter,* 782 F.2d 1275 (5th Cir.1986); *see also, Gray v. Greer,* 778 F.2d 350 (7th Cir.1985), *vacated on other grounds* — U.S. ——, 106 S.Ct. 3328, 92 L.Ed.2d 734 (1986). This court has not addressed that issue and it is not necessary in this case to do so. If the proper focus is the out-

come of the challenged appeal, Matire has satisfied the prejudice prong as indicated in the text. If the proper focus is the projected outcome of a retrial assuming reversal of the conviction on appeal, our confidence in that outcome is also undermined in this case. At the original trial the evidence of insanity was considerably more forceful than the evidence of sanity. There is a reasonable probability that the outcome of a new trial would be different.