UNITED STATES of America, Plaintiff–Appellee,

v.

Rafael S. PENA, Gary W. Chitty, Defendants–Appellants.

No. 88–5895.

United States Court of Appeals, Eleventh Circuit.

April 2, 1990.

---

Paul Morris, Coral Gables, Fla., for Rafael S. Pena.

Mel Black, Miami, Fla., for Gary W. Chitty.

Dexter W. Lehtinen, U.S. Atty., William Xanttopoulos, Linda C. Hertz, and Lynne Lamprecht, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before HATCHETT and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

Following a four-day trial in the United States District Court for the Southern District of Florida, a jury found Gary W. Chitty and Rafael S. Pena guilty of both conspiracy to import and the importation of more than 100 kilograms of marijuana into the United States, in violation of 21 U.S.C. §§ 963, 952(a) and 960(a)(1) and 18 U.S.C. § 2. Chitty appeals the district court's denial of his motion in limine in which he sought to exclude certain testimony as an impermissible comment upon his exercise of his right to remain silent. Pena appeals the district court's denial of his alternative motion either to sever his trial from that of Chitty or to exclude pursuant to Fed.R. Evid. 403 certain statements made by Chitty. Both men assign as error the district court's supplementation of the jury instructions. We affirm.

## FACTS

### The Flight

At approximately 10:00 p.m. on February 3, 1988, a radar operator for the United States Customs Service ("USCS") detected a slow moving aircraft flying low over the Gulf of Mexico toward the Florida coastline. Radar placed the aircraft at a point

beyond the twelve-mile United States customs boundary approximately 100 miles southwest of Cross City, Florida. Inquiries failed to reveal a filed flight plan which would have explained the aircraft's presence, and the aircraft failed to display a transponder code which would have identified it on the radar screen.

The Customs Service initiated an investigation, and a Customs' Citation jet located the unidentified airplane flying without its lights over the Gulf. The Citation remained from one-half to one and one-half miles behind as the airplane flew toward and over the Florida coast. During the course of the evening, additional USCS aircraft participated in the surveillance, including a second Citation jet, a Piper Navajo, a King Air and a Blackhawk helicopter. The Piper Navajo and the King Air assumed primary responsibility for the pursuit as the airplane flew on a southerly course over the central part of Florida. Southwest of Vero Beach, Florida, the occupants dropped several bags of what turned out to be marijuana from the left rear hatch of the target airplane. The King Air continued the pursuit and observed additional drops as the airplane proceeded southward.[1] Near Miami, the second Citation jet and the helicopter joined the aerial chase. At approximately 1:30 a.m. on February 4th, the airplane landed at Marathon, Florida, where the appellants Chitty and Pena disembarked and were arrested.[2]

An examination of the appellants' airplane revealed that all of the passenger seats had been removed and that an illegal, distance-enhancing fuel bladder was on board.[3] Consistent with their observations that objects had been dropped from the plane during flight, USCS personnel noted torn weather stripping bordering the left rear hatch of the airplane and dents in the plane's left rear tail section. The officers discovered no marijuana on board the aircraft; nor did the appellants possess any contraband. A test conducted for cannabis residue on the appellants' hands proved negative.[4]

### The Statements

After the arrest of Chitty and Pena, Customs Service officers separated the two men. David Zawatski first advised Chitty of his *Miranda*[5] rights at approximately 2:00 a.m. on February 4th. Chitty declined an invitation to discuss the evening's events, and officers transported the two suspects to the Monroe County, Florida, sheriff's station. USCS Special Agent Michael McCage arrived there at approximately 7:45 a.m. that morning. Along with officer Brian Marrow, who advised Chitty of his *Miranda* rights for a second time, McCage interviewed Chitty. After gathering certain biographical data, McCage offered Chitty a second opportunity to discuss the events of February 3rd and 4th. Chitty refused. Less than one hour later, McCage and Special Agent Altman interviewed Chitty a third time. Altman advised Chitty of his rights and read to him

1. The Piper Navajo remained in the vicinity of the first drop zone, and its crew directed ground personnel to 699 pounds of marijuana. They also discovered fresh tire tracks. Law enforcement officers found five additional bags of marijuana south of the initial drop zone along the airplane's flight path. The first Citation jet had broken off the pursuit to refuel prior to the initial drop.

2. USCS personnel maintained constant radar contact with the target aircraft from the moment of its first appearance over the Gulf until it landed at Marathon, except for some thirty seconds during which the plane made a low altitude pass over an airstrip near Lake Okeechobee, Florida. During that thirty-second interval, Customs Service personnel in the pursuing aircraft maintained visual contact with the

plane occupied by Chitty and Pena. The integrity of both the pursuit and the identification was enhanced by the availability and use of FLIR viewing screens on board both of the Citation jets and the King Air. These screens utilize a heat-seeking technology which enables technicians to observe objects in the absence of light. The Blackhawk helicopter pilot employed similar technology in his night vision goggles.

3. The fuel bladder was not attached at the time of the search.

4. This test was conducted after the appellants had washed their hands.

5. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

from a form which included a waiver of those rights. Chitty signed the form.[6] As memorialized by agents McCage and Altman, the following conversation ensued.

When asked if he wished to cooperate with the government Chitty stated, 'I want to. I really want to but, [sic] I can't. They will kill my parents.'

Upon being advised that marijuana had been recovered from the site, Chitty slumped in his chair, covered his face, shook his head negatively (from side to side) and stated, 'I've made a big mistake. I've made the biggest mistake of my life.'

When asked what was jettisoned from the airplane Chitty responded, 'I really want to cooperate. I really want to help you but my father taught me to be loyal. I really can't give these people up.'

When asked who they were Chitty stated 'These people I'm in with. I can't tell you who they are. They will kill my family.'

S/A Terry Altman made the statement, 'Gary we can protect your family from these people.' Chitty responded, 'No you can't. The government can't protect my family. I would have to lie to you and my father taught me not to lie.'

ROA Record Excerpts—Docket No. 3; *see* Supp.ROA Vol. 2, 84–86.[7] Prior to the trial, the government notified defense counsel of its intention to introduce the above statements at the trial. This notice prompted defense counsel to file several motions.

*The Defense Motions*

Chitty moved to suppress the statements on the ground that they were not voluntarily made. The district court, after a hearing, denied the motion, finding that the agents involved had scrupulously honored Chitty's constitutional rights. The district court also found that Chitty had signed the waiver form and that the statements elicited thereafter should not be suppressed. Chitty does not appeal the district court's decision that the statements were voluntarily made. However, he also moved in limine to exclude the statements, contending that they "constitute a clear invocation by the Defendant of his right to remain silent" and that the introduction of the statements at trial "would constitute a comment upon the Defendant's exercise of his right to remain silent." ROA Record Excerpts—Docket No. 3, 1, 2. The district court denied Chitty's motion in limine. In so ruling, the district court commented upon the similarity between Chitty's motion to suppress and his motion in limine and advised Chitty that it did not find an invocation of the right to remain silent in the statements.[8]

Pena, against whom Chitty's statements were inadmissible, filed a motion pursuant to Fed.R.Crim.P. 14 [9] to sever his trial from the trial of Chitty on the basis that the statements made by Chitty amounted to a confession the introduction of which would undermine his defense and would prejudice his right to a fair trial. In arguing the motion and in an attempt to illustrate the prejudicial nature of a joint trial, Pena's attorney proffered his defense strategy.

---

**6.** The government was unable to produce this form either during the hearing on Chitty's motions or during the trial. Government witnesses explained that the form had been lost. Chitty produced no evidence disputing the government's evidence that he had signed the form.

**7.** The questions, statements and responses reproduced here in their proper order were listed out of sequence on Altman and McCage's memorandum. McCage testified as to the correct sequence of the discussion during the hearing on Chitty's motion to suppress. *See* Supp. ROA Vol. 2, 85.

**8.** The district court's exact quote was as follows: "I just don't find what you see in the statements." ROA Vol. 5, 11. This statement unam-

biguously refers to Chitty's contention that the disputed statements constitute an invocation of his right to remain silent, and we proceed on that basis.

**9.** In pertinent part, Rule 14 of the Federal Rules of Criminal Procedure provides as follows:

If it appears that a defendant ... is prejudiced by a joinder ... of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

In essence, he hoped to discredit the surveillance employed by the Customs Service during its pursuit of the then unidentified airplane, and by so doing to undermine the government's case that the airplane which landed at Marathon was the same airplane which had dropped several bags of marijuana southwest of Vero Beach, Florida. Pena intended to bolster his theory of misidentification by introducing evidence that Pena was on this occasion traveling to Marathon with Chitty on a fishing expedition.[10] Pena urged that Chitty's statements, if introduced at trial, would vitiate such a defense. In the alternative, Pena moved to exclude Chitty's statements pursuant to Rule 403 of the Federal Rules of Evidence[11] as unduly prejudicial in light of their limited probative value. The district court denied the alternative motion but agreed to give a limiting instruction that the jury should not to consider Chitty's statements as evidence of Pena's guilt.

*The Trial*

During the trial, Special Agent Terry Altman of the Customs Service testified in relevant part as follows:[12]

Q  Did there come a time when you confronted Mr. Chitty with the fact that some marijuana had been dropped from a drop site?

A  Yes, sir, I did.

Q  And at the time that you did that, what did Chitty do and what did he say?

A  Chitty responded that I've made a big mistake. The biggest mistake of my life and shook his head in a negative fashion.

Q  After he did that, did you inquire of Mr. Chitty as to whether he would like to cooperate with the government?

A  Yes, sir I did.

Q  And in response to your question, what did he tell you?

A  He stated that he would like to cooperate with the government however they would kill him and his parents.

Q  Did you ask him who the people were?

A  Yes, I did.

Q  What did he tell you?

A  He did not respond. He didn't identify anybody.

. . . .

Q  And do you recall asking—or did you ask Mr. Chitty what it was that he jettisoned from the plane?

A  I asked what was jettisoned from the airplane.

Q  And what did he tell you?

A  Chitty responded I really want to cooperate. I really want to help you but my father taught me to be loyal. I really can't give these people up.

Q  And did you tell him that we can protect your family from these people?

A  I stated that Gary, we can protect your family from these people. Chitty responded no, you can't. The government can't protect my family. I would have to lie to you and my father taught me not to lie.

ROA Vol. 7, 182–186.[13]

At the close of the evidence and before the arguments to the jury, the court con-

---

**10.** Allegedly, Chitty and Pena frequently traveled to Marathon, where Chitty's family maintained a residence, to fish.

**11.** Fed.R.Evid. 403 provides as follows:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**12.** Prior to and at the conclusion of this testimony, the district court issued an instruction to the jury limiting the probative value of the evidence to the government's case against Chitty and ex-

plaining that the evidence was not applicable to the case against Pena.

**13.** As noted earlier the above exchange was reported during the trial out of sequence, that is, the conversation was reported as recorded on the government's memorandum and not as corrected by the government's witness during the hearing on Chitty's motion to suppress. *See* n. 7 *supra.* We consider the reversal significant and emphasize it because Chitty's exclamation that he had made the biggest mistake of his life likely would be admissible if it had been uttered prior to his refusal to cooperate for fear of injury to his parents. *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726 (volunteered statements not barred by the fifth amendment).

ducted a charge conference as contemplated by Rule 30 of the Federal Rules of Criminal Procedure. In light of the indictment charging the defendants with importing marijuana into the United States, the district court informed all counsel of its intention to instruct the jury as follows on the meaning of "to import":

> to import a substance means to bring or transport that substance into the United States from some place outside the United States.

Counsel neither objected to the court's intended instruction nor proposed an instruction defining what constituted "some place outside the United States."

During closing argument Chitty's counsel, arguing the "legal" issues in the case for both defendants, stated to the jury that it must "decide whether or not [someplace over water] constitutes a place outside the United States...." ROA Vol. 8, 118. The government objected, and the court, without sustaining or overruling the objection, informed the jury that it would instruct it at a later time. Chitty's counsel persisted in his argument:

> You have to determine whether or not [the prosecutor's] view that a plane was outside of the territorial limit means that it came from a place outside of the United States and I would just point out to you, and if you boared [sic] a plane, a commercial flight from Miami to New York you would certainly go out over water and yet you would not be involved if you were carrying marijuana in importation of marijuana into the United States because that's purely a domestic flight. Likewise, a flight from Miami to New Orleans would be purely a domestic

flight even though it went hundreds of miles out over the Gulf of Mexico. We know what the logical and reasonable and common sense meaning a place outside of the United States means and that means from a land place or flying to a boat outside the United States.

*Id.* at 119. The government objected a second time, and the court reiterated that it would instruct the jury as to the applicable law. Defense counsel continued without further objection, never retreating from his position that the jury was free to determine that an airplane entering the United States from beyond the twelve-mile customs boundary had not come from a place outside the United States.

After both defense attorneys had concluded their closing argument, the court informed all of the attorneys of its intention to clarify the misconception created by Chitty's counsel with respect to "a place outside the United States." [14] "I would add this definition right under importation ... and I would say a place outside the United States includes any place, including air space in excess of 12 geographical miles seaward from the coast of Florida." *Id.* at 151. Over Chitty's objections that any supplementation by the court would undermine the effectiveness of his argument, cast doubt about his credibility and be equivalent to directing the jury to return a verdict of guilty, this addition was included in the court's instructions to the jury. *Id.* at 170.

## DISCUSSION

Prior to interrogation, a suspect in custody must be informed "in clear and unequivocal terms that he has the right to remain

---

Both the prosecutor and Chitty's counsel referred to these statements during closing arguments. The prosecutor paraphrased most if not all of the questions and responses reported above. *See* ROA Vol. 8, 109–10, 162. References of Chitty's counsel focused upon the credibility of the witnesses who repeated the exchange between the special agents and Chitty. *Id.* at 127–31. Pena's attorney, mentioned the statements only briefly. He did not discuss the substance of those statements. *Id.* at 146.

**14.** That the lawyer's argument misstated the law is clear, and he admitted as much during oral

argument before this panel. In considering an identical assignment of error in *United States v. Lueck,* 678 F.2d 895, 904–05 (11th Cir.1982), the panel rejected the position that proof of importing controlled substances required evidence that the contraband was imported from a specific point on foreign soil. "The fact of crossing the boundary of the United States with contraband suffices to establish importation...." *Id.* at 905. In *Lueck,* the district court employed language nearly identical to the language employed in this case to explain "a place outside the United States."

silent." *Miranda v. Arizona*, 384 U.S. 436, 467–68, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694, 720 (1966); U.S. Const. amend V.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court reiterated the vitality of *Miranda* and stressed the importance of a suspect's right to remain silent.

A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt 'fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ...' 384 U.S. at 479, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' Id., at 474, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. ... We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'

*Mosley*, 423 U.S. at 103–04, 96 S.Ct. at 326–27, 46 L.Ed.2d at 321 (footnote omitted).

■ To give effect to a suspect's right to remain silent, this circuit prohibits the ad-mission during the government's case-in-chief of that suspect's expressions of intent to remain silent. *United States v. Stevens*, 538 F.2d 1203, 1204–05 (5th Cir.1976).[15] "Where a defendant's post-*Miranda* utterance is an ambiguous expression of his desire to remain silent, that utterance should receive the same treatment as naked silence." *United States v. Johnson*, 558 F.2d 1225, 1228 (5th Cir.1977). Therefore, where an individual in custody makes an equivocal invocation of his right to remain silent, further questioning must be restricted to clarifying that request until it in fact is clarified, and no statement taken after the request but before the clarification can clear the *Miranda* hurdle. *Martin v. Wainwright*, 770 F.2d 918, 924 (11th Cir.1985), *modified*, 781 F.2d 185 (11th Cir. 1986), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (statements made after accused had been read and had waived his *Miranda* rights and after he had made an equivocal invocation of his right to cut off questioning held inadmissible). "The determination of whether a suspect's right to cut off questioning was scrupulously honored requires a case-by-case analysis." *Christopher v. State of Fla.*, 824 F.2d 836, 840 (11th Cir.1987) (citation omitted).

■ After reading Chitty his *Miranda* rights and after he had waived those rights, the special agent asked Chitty if he wished to cooperate. His response—"I want to. I really want to but, [sic] I can't. They will kill my parents"—if not a clear invocation is at the very least an uncertain invocation of his fifth amendment right to remain silent. The Customs Service agent made no attempt to clarify Chitty's statement. Instead, the government informed Chitty that marijuana had been recovered, thereby eliciting his exclamations of regret.[16] "I've made a big mistake." Despite Chitty's recalcitrance, the agents

---

15. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

16. This practice of permitting interrogators to apprise a suspect of the evidence against him as a prelude to asking him to reconsider his decision to remain silent has been brought into doubt by *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980). Here, the agent did not ask Chitty to reconsider. He simply continued the interview.

pressed forward, eliciting additional ambiguous invocations of his right to remain silent. "I really want to cooperate. I really want to help you but my father taught me to be loyal. I really can't give these people up."

In *Johnson,* 558 F.2d at 1228–29, the panel observed that the defendant's "expression of a desire to remain silent was coupled with other words indicating something else—a desire to cooperate or to tell the customs officials something, and an assertion that she had an explanation." Continuing, the court stated that "in each instance the desire to remain silent was so tightly intertwined with the other utterance that the two portions must be considered as a whole—a single testimonial entity. Any other rule would be highly artificial...." *Id.* at 1229.

Like the defendant in *Johnson,* Chitty expressed conflicting desires to cooperate and to remain silent. These conflicting desires combined to create an ambiguous utterance. Having heard such, the customs officials should have sought to clarify Chitty's uncertainty. Their having failed to do so precludes us from determining that the law enforcement officials "scrupulously honored" his assertion of that right. We conclude, therefore, that Chitty's statements were inadmissible and that the district court erred in denying his motion in limine to exclude from the trial government testimony reporting those statements.[17]

Having concluded that the statements should not have been admitted into evidence at the trial, it follows *a fortiori* that the testimony of Agent Altman constituted an impermissible comment on Chitty's right to remain silent. *See Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987). Even so, such error is not necessarily fatal to the convictions. The harmless error doctrine is applicable to this type of constitutional flaw. *Chapman v. United States,* 547 F.2d 1240, 1248 (5th Cir.1977), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1972); *United States v. Smith,* 635 F.2d 411 (5th Cir. Unit B 1981).[18] An error of constitutional magnitude is harmless if the government proves beyond a reasonable doubt that the admission of the statements did not contribute to the verdict obtained. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Martin v. Wainwright,* 770 F.2d at 932 n. 23; *Christopher v. State of Florida,* 824 F.2d at 846. This analysis "requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Meneses–Davila,* 580 F.2d 888, 890 (5th Cir.1978).[19]

**17.** We note that this conclusion might appear at variance with the district court's conclusion in ruling on the motion to suppress that Chitty voluntarily waived his rights. However, a waiver does not preclude a suspect from deciding at a later time to invoke his fifth amendment right to cut off questioning. *See Martin v. Wainwright, supra; see also Michigan v. Mosely, supra.*

**18.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**19.** Though aware that the facts of each case will vary, the court in *Meneses–Davila* developed three categories into which prosecutorial comment on a defendant's silence might fall:

(1) When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.

(2) When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

(3) When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

*Meneses–Davila,* 580 F.2d at 893, citing *Chapman,* 547 F.2d at 1249–50. *See Matire,* 811 F.2d at 1436 (quoting *Meneses–Davila* ).

■ Though the prosecution directly elicited Agent Altman's testimony which resulted in an impermissible comment upon Chitty's right to remain silent, that testimony accounted for only a few moments of testimony during a four-day trial. The prosecutor neither focused upon nor highlighted Chitty's statements during either his examination or his cross-examination of other witnesses. During his closing argument, the prosecutor briefly alluded to Chitty's statements as evidence of his "guilty mind," but he did not highlight those statements in any attempt to discredit Chitty's defense. Moreover, an examination of the evidence discloses the government's case against Chitty to be overwhelming, while his defense that the USCS followed the wrong plane and that he was only going fishing is revealed as transparently frivolous. Customs Service officials followed Chitty's plane from the Gulf of Mexico to the plane's touchdown at Marathon, observing several drops during the plane's progress through the heart of Florida. Never once was the plane lost from either radar contact or visual observation. The physical evidence on the airplane strongly corroborates the observations of the airborne pursuers. Therefore, though this case falls short of fitting neatly into any one of the three previously defined categories, *see* n. 19 *supra,* we conclude that the district court's denial of Chitty's motion in limine, a denial which resulted in the erroneous admission into evidence of Chitty's invocation of his right to remain silent, constitutes harmless error.

■ We turn next to Pena's claim that the district court erred in denying his motion in the alternative either to sever the defendants' trials under Fed.R.Crim.P. 14, or to exclude Chitty's post-arrest, post-*Miranda* statements pursuant to Fed.R.Evid. 403. In light of our determination that the

statements were admitted improperly, we consider whether Pena has established clear and compelling prejudice.[20]

Pena maintains that compelling prejudice is found here "because the jury could not ignore the evidence associating Chitty with persons who would kill him and his family." Appellant Pena's Brief on Appeal at 21. During oral argument, he repeated his assertion made first before the district court that the statements introduced at the trial undermined his defense that the government mistakenly followed the wrong airplane to Marathon, Florida.

On three occasions—both prior to and at the conclusion of Agent Altman's testimony, and again during its final charge—the court, by instruction, clearly limited the applicability of the disputed evidence to the government's case against Chitty. The court expressly precluded the jury's consideration of that evidence in its deliberations of Pena's guilt or innocence.

Additionally, we observe again that Pena's defense, like the defense offered by Chitty, is transparently frivolous. Consequently, Pena's argument concerning the detrimental effect of Chitty's statements on his defense is without merit.

The district court's frequent instructions limited the likelihood of any "spill-over effect," and they permitted the jury to separate the evidence relevant to each defendant and to render a fair and impartial verdict as to each. *See United States v. Butler,* 792 F.2d 1528, 1534 (11th Cir.1986), *cert. denied sub nom., Waites v. United States,* 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986); *United States v. LaChance,* 817 F.2d 1491 (11th Cir.1987), *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987). Under these circumstances, we hold that Pena has failed to

---

**20.** Under normal circumstances, an appellate court will reverse the district court's denial of a Rule 14 motion to sever only if the district court abused its discretion. An abuse of discretion is shown by demonstrating compelling prejudice. *United States v. Astling,* 733 F.2d 1446, 1454, (11th Cir.1984). Similarly, the district court's decision pursuant to Federal Rule of Evidence 403 to admit certain evidence is reviewable only

for clear abuse of discretion. *United States v. Meester,* 762 F.2d 867, 874 (11th Cir.1985), *cert. denied sub nom., Sawyer v. United States,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). Here, we have determined that the district court erred. Therefore, we consider whether the improper introduction of the evidence resulted in compelling prejudice to Pena's right to a fair trial.

demonstrate clear and compelling prejudice.

■ Chitty and Pena assign as a final error a violation of Fed.R.Crim.P. 30. That rule requires the court to inform counsel of its proposed action upon any requests to charge prior to counsel's closing argument to the jury.[21] This procedure enables counsel to argue intelligently the case to the jury. *United States v. Clark*, 732 F.2d 1536, 1541 (11th Cir.1984). This circuit requires substantial compliance with Rule 30, and a conviction will be reversed due to a violation of the Rule only where a defendant establishes prejudice. *Id.* (footnotes and citations omitted). Reversal is justified "when the change in the instructions is substantial, when the judge's instructions repudiate counsel's argument, or when the judge's instructions impair the effectiveness of the attorney's argument." *Id.* at 1541–42 (footnotes and citations omitted).

Here, Chitty and Pena do not argue that the district court failed to convene a charge conference. Nor do they claim that the court failed to inform counsel of its proposed action upon the submitted requests. Instead, they insist that the district court committed reversible error by supplementing the agreed-upon jury instructions with a short charge correctly stating the legal meaning of "a place outside the United States," an addition necessitated by defense counsel's admittedly incorrect statement of the law during his closing argument. We find this argument absurd.

■ First, seen clearly through the smokescreen, the appellants' argument is not one firmly founded in Rule 30. Rule 30 is a mandatory rule requiring the district court "to inform counsel what action [it] will take relative to the *requested* jury instructions." *United States v. Mendoza*, 473 F.2d 697, 700 (5th Cir.1973) (emphasis added). The appellants did not request any charge defining "a place outside the United States," much less one which defined it incorrectly. Second, to the extent that this argument implicates Rule 30, the 1987 amendment to that Rule makes it plain "that the court retains power to remedy omissions in pre-argument instructions or to add instructions necessitated by the arguments." Fed.R.Crim.P. 30 advisory committee's notes; *see also United States v. Oliver*, 766 F.2d 252, 254 (6th Cir.1985) (proper for court to recharge jury to correct possible misunderstandings which arise as a result of inadequately defining the elements of an offense). The supplementary instruction in this case was necessitated by defense counsel's blatant misstatement of the law.[22] The change in the instructions was not substantial, and though that change to some extent repudiated one of counsel's arguments, for the district court to have ignored his misstatement would have resulted in a verdict reached in contravention to the law. Any diminished effectiveness[23] of Chitty's counsel is the result of counsel's omission, inadvertent or otherwise, of a requested charge

21. The full text of Rule 30 provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to all parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The court may instruct the jury before or after the arguments are completed or at both times. No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of

the hearing of the jury and, on request of any party, out of the presence of the jury.

22. We note that the better practice in a situation such as the one before us, where opposing counsel has objected to a closing argument based upon alleged misstatements of the law, requires the district court to sustain the objection out of the hearing of the jury to enable counsel to avoid such misstatements. We also note that in this case counsel should have recognized the error of his ways. The district court's response to the prosecution's objections made clear its intention to inform the jury as to the correct version of the law and by implication should have informed the defense attorney that he was treading on unsound footing.

23. We express no opinion concerning the lawyer's "effectiveness" as counsel for Chitty.

expressing his view of what constitutes "a place outside the United States" and of his incorrect argument to the jury based thereon. We do not believe that the requirements of Rule 30 function as a limitation on the district court's obligation to inform the jury of the law which properly governs a case. Nor do we believe that the limitations contained in Rule 30 operate to empower counsel, through the mechanics of the closing argument, either to dictate the law by which a verdict is reached or to create a mistrial by erroneously stating the legal principles applicable to a given situation.

Accordingly, the judgments of conviction are

AFFIRMED.