Rehearing en banc granted by order
filed 2/23/00; published opinion
filed 12/2/99 is vacated

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 98-7002
(CA-97-232-5-H)

Ernest Sutton Bell,

Petitioner - Appellant,

versus

Mack Jarvis, et al,

Respondents - Appellees.

O R D E R

The court amends its opinion filed December 2, 1999, as follows:

On page 10, line 3 of second indented quotation -- the phrase "factors to be considered" is corrected to read "factors to be weighed."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ERNEST SUTTON BELL,
Petitioner-Appellant,

v.                                                              No. 98-7002

MACK JARVIS; ROBERT SMITH,
Respondents-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-97-232-5-H)

Argued: June 11, 1999

Decided: December 2, 1999

Before MURNAGHAN and TRAXLER, Circuit Judges,
and BUTZNER, Senior Circuit Judge.

_____

Reversed and remanded by published opinion. Senior Judge Butzner
wrote the majority opinion, in which Judge Murnaghan joined. Judge
Traxler wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Kathryn L. VandenBerg, NORTH CAROLINA PRIS-
ONER LEGAL SERVICES, INC., Raleigh, North Carolina, for
Appellant. Ellen Bradshaw Scouten, Special Deputy Attorney Gen-
eral, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellees. **ON BRIEF:** Michael F. Easley, Attor-

ney General of North Carolina, NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

Ernest Sutton Bell appeals the district court's dismissal of his peti-
tion for habeas corpus. Bell challenges his convictions for rape and
other sexual offenses on the ground that his appellate counsel failed
to argue that the trial court, despite an objection, improperly closed
the courtroom. Because Bell's appellate counsel was constitutionally
ineffective, we reverse and remand the case for conditional issuance
of the writ of habeas corpus.

I

Bell was indicted for raping and otherwise sexually assaulting his
step-granddaughter, Wendy Harris, between March 1990 and May
1992. Following a jury trial, Bell was convicted in the Pitt County,
North Carolina, Superior Court on January 14, 1994, of eight counts
of first-degree rape, four counts of first-degree sexual offense, nine-
teen counts of second-degree rape, and twenty-seven counts of taking
indecent liberties with a minor. The trial court sentenced Bell to two
life terms plus seventy years.

Bell frames the issue on appeal before this court as follows:
"Whether the District Court erred in denying the petition for writ of
habeas corpus based on ineffective assistance of appellate counsel,
where appellate counsel failed to raise on direct appeal the issue that
Petitioner's right to public trial was violated." Appellant Br. at 2.

Bell raised numerous claims on direct appeal. Although Bell's
counsel assigned error to the closing of the courtroom, she did not
brief the issue before the state intermediate appellate court, the Court
of Appeals. Deeming the claim abandoned, the Court of Appeals did
not discuss it. The Court of Appeals found no merit in the contentions

2

counsel had briefed on appeal. See State v. Bell, 117 N.C. App. 732, 453 S.E.2d 877 (1995) (table).

Bell subsequently filed a motion for appropriate relief in the Pitt County Superior Court, in which he contended that his counsel on direct appeal was ineffective for failing to raise the public trial claim. The Superior Court summarily denied Bell's motion, State v. Bell, No. 92 CRS 12536 et al. (N.C. Sup. Ct. Pitt County, Nov. 8, 1996), and the North Carolina Court of Appeals rejected Bell's petition for certiorari. State v. Bell, No. COAP96-591 (N.C. Ct. App. Dec. 31, 1996).

On April 9, 1997, Bell filed the instant petition in the District Court for the Eastern District of North Carolina. The magistrate judge concluded that Bell's counsel had provided ineffective assistance for failing to present a meritorious public trial claim. The magistrate judge recommended that Bell be granted a new direct state appeal. The district court rejected the magistrate judge's recommendation, holding that appellate counsel was not ineffective because the trial court did not err in closing the courtroom, and it granted summary judgment in favor of the State, dismissing Bell's habeas petition. Bell v. Jarvis, 7 F. Supp. 2d 699 (E.D.N.C. 1998).

II

Bell must exhaust his state court remedies before this court may examine the merits of his claims. See 28 U.S.C.A. § 2254(b)(1) (West Supp. 1999). Bell raised his ineffective assistance claim in his petition for state postconviction relief and his subsequently denied petition for certiorari before the North Carolina Court of Appeals.

Recently, the Supreme Court held that the exhaustion doctrine requires that state prisoners "file petitions for discretionary review when that review is part of the ordinary appellate procedure in the State." O'Sullivan v. Boerckel, 119 S.Ct. 1728, 1733 (1999). The Court explained: "The particular question posed by this case is whether a prisoner must seek review in a state court of last resort when that court has discretionary control over its docket." Id. at 1731. The Court held that an Illinois state prisoner seeking federal habeas relief had not exhausted his state remedies when he failed to present

3

certain claims, on direct appeal, in a petition for certiorari before the Supreme Court of Illinois. Id.

Bell did not petition the North Carolina Supreme Court for discretionary review of the Court of Appeals' decision on direct appeal. North Carolina prisoners who are convicted at trial and lose their direct appeal before the Court of Appeals may petition the state Supreme Court for discretionary review. See N.C. Gen. Stat. § 7A-31(a) (1995).

Bell, however, fully litigated his ineffective assistance claim in state postconviction proceedings. North Carolina provides, by statute, that state prisoners seeking postconviction relief may petition the Court of Appeals for a writ of certiorari. See § 15A-1422(c)(3) (1997). Decisions of the Court of Appeals concerning postconviction motions are final and may not be reviewed by the North Carolina Supreme Court. See §§ 7A-28(a) (1995), 15A-1422(f) (1997). Bell has given the North Carolina courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 119 S. Ct. at 1732.

The exhaustion doctrine is premised on notions of comity and is not jurisdictional. Rose v. Lundy, 455 U.S. 509, 515 (1982). The state may concede exhaustion by unconditionally waiving the requirement. Sweezy v. Garrison, 694 F.2d 331 (4th Cir. 1982). The State did so before the district court, expressly conceding:

> Petitioner has raised the substance of his present claims in the courts of North Carolina as required by 28 U.S.C. 2254(b)(1)(A) (1996). He has thereby exhausted state remedies.

J.A. 102-03.

Procedural default is not an issue in this case; the state courts did not decide, and the State does not claim, that Bell is procedurally barred from raising the issue that is the subject of this appeal.

4

III

The Antiterrorism and Effective Death Penalty Act of 1996 establishes the applicable standard of review. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). The Act provides that the writ may issue if the adjudication of petitioner's claim on the merits by state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West Supp. 1999). If the state court decision is in "square conflict" with a Supreme Court precedent that is controlling as to law and fact, the writ should issue. Green v. French, 143 F.3d 865, 870 (4th Cir. 1998). In the absence of controlling precedent, section 2254(d)(1) is satisfied "only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Id.

IV

The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. amend. I. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. As Chief Justice Burger explained in an opinion for the Court, "[t]he right to a public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 7 (1986) (Press-Enterprise II). The Supreme Court in Waller v. Georgia, 467 U.S. 39 (1984), held that "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." Id. at 46. When analyzing the propriety of trial closure under either the First or Sixth Amendment, a court is required to conduct the same searching inquiry. See id. at 47-48 (holding that satisfaction of the Sixth Amendment requires meeting the First Amendment "tests set out in Press-Enterprise [Co. v. Superior Court of California, 464 U.S. 501 (1984) (Press-Enterprise I)] and its predecessors").

By guaranteeing that criminal trials shall be open and public, the Constitution affirms an adjudicative tradition originating before the

5

Norman Conquest. See Press-Enterprise I, 464 U.S. at 505. An open courtroom promotes honest testimony, the appearance of witnesses otherwise unknown, and conscientious performance by all trial participants. See Gannett Co. v. DePasquale, 443 U.S. 368, 383 (1979). With the knowledge that "every criminal trial is subject to contemporaneous review in the forum of public opinion," a defendant's triers are kept "`keenly alive to a sense of responsibility and to the importance of their functions.'" In re Oliver, 333 U.S. 257, 270 and n.25 (1948) (citation omitted). In this manner, a public trial operates "as a safeguard against any attempt to employ our courts as instruments of persecution." Id. at 270.

Although the public trial guarantee was created for the defendant's benefit, see Waller, 467 U.S. at 46, the right also serves a broader purpose: securing public confidence in the criminal justice system generally, and in a trial verdict particularly. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 602-06 (1982) (confirming that the public has a First Amendment right of access to a courtroom). A public trial gives citizens information necessary to understand and discuss their justice system. Id. at 604-05. Just as importantly, "people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." Press-Enterprise I, 464 U.S. at 508. As this court has recognized, visible standards of fairness benefit the defendant and the public:

> The right to a public trial is not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake, for a secret trial can result in favor to as well as unjust prosecution of a defendant.

Lewis v. Peyton, 352 F.2d 791, 792 (4th Cir. 1965). Additionally, an open trial can ameliorate the emotions and reactions engendered by criminal acts. See Press-Enterprise I, 464 U.S. at 508-09. This therapeutic benefit will be especially important where a defendant stands accused of violent acts. See id.

The Sixth Amendment establishes a strong presumption in favor of a public criminal trial. This right, however, is not absolute. See Globe

6

Newspaper Co., 457 U.S. at 606. "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 U.S. at 45. In Press-Enterprise I, the Court stated that the strong presumption in favor of openness may be overcome "only by an overriding interest based on findings that closure is essential." 464 U.S. at 510. "Such circumstances will be rare." Waller, 467 U.S. at 45.

Before a trial court may close a courtroom, four conditions must be satisfied: (1) the party seeking closure must advance an overriding interest likely to be prejudiced if the courtroom remains open; (2) closure must be no broader than necessary to meet that interest; (3) the trial court must consider reasonable alternatives to closure; and (4) the court must make "findings adequate to support the closure." Waller, 467 U.S. at 48.

Before Bell's trial, the prosecution moved that the courtroom be closed during testimony of the minor prosecuting witness. In its entirety, this discussion ran as follows:

> Prosecutor: . . . And Judge, we have an outstanding motion I forgot to bring up earlier that the State had about closing the courtroom when at least Wendy testifies or all of the children testify at the appropriate time.
>
> The Court: Is there any objection to that motion?
>
> Counsel for Bell: Yes, sir, we would object to closing the courtroom. We believe that would impact on our client's constitutional right to a public trial. We would oppose it.
>
> The Court: Well --
>
> Prosecutor: I would argue that that is contrary to case law in this state. [Apparently the prosecutor was referring to N.C. Gen. Stat. § 15-166 (1983), which permits the trial court to exclude bystanders from sex offense trials.]

7

The Court: The Court is going to allow that motion and we'll do it in the most discreet way possible so the jury doesn't even notice it unless someone else calls it to their attention. We can take a short recess, and I can excuse the jury and I can then tell the others--other people in the courtroom that this is testimony of an apparent delicate nature. I don't see anything wrong with that. I am going to allow that motion.

J.A. at 280-81.

The trial court, at the suggestion of the prosecutor, closed the courtroom during the empaneling of the jury, the court's introductory statements to the jury, the attorneys' opening statements, and the testimony of the prosecutrix. The trial court permitted family members and friends of the prosecutrix to remain, but other persons were excluded from the courtroom. At one point during the testimony of the prosecutrix, the court admonished the remaining spectators to stop nodding and otherwise encouraging the witness. The record does not indicate conclusively whether the courtroom was closed during the testimony of the other two minor witnesses. There is no record whether members of the press, if present at trial, were excluded, but the trial court excluded "other people" in the courtroom and its order was broad enough to exclude the press.

The North Carolina Court of Appeals outlined testimony in the case:

The sixteen-year-old prosecuting witness, hereinafter referred to as Jane Doe, testified that in March of 1990, while spending the weekend with defendant, who is her step-grandfather, and her grandmother, she awoke to find defendant lying naked on her bed. Defendant rubbed her "butt," put his finger in her vagina, rubbed her breasts, "french kissed" her, put his penis inside her vagina and rectum, and put his tongue in her vagina. Defendant also put her hand on his penis and told her to rub it back and forth. Thereafter, whenever she spent the weekend at defendant's house, approximately once or twice per month, defendant would "put his penis in [her] vagina." Defendant would also

8

come to her house and engage in sexual intercourse with her after school about two times per week. Jane Doe never told anyone except a friend, Vicki M., about these incidents because defendant threatened "not to love her" if she told. She eventually told her mother and aunt about defendant's activities with her in late May of 1992.

Vicki M. testified that she spent a Saturday night with Jane Doe at defendant's house in 1990 and that as the two girls played on the floor with a dog, defendant joined them and touched Vicki's breasts, vagina and butt. The next day, she asked Jane Doe whether defendant had touched her private parts. Jane Doe told her defendant had touched her and had sex with her. Jane Doe told her all of the details. In May of 1992, Vicki M. spent the night with Jane Doe at the defendant's residence. During the night, defendant came in and put his hand under her clothes, and touched her breasts, vagina and butt.

Toni A. testified that she sometimes spent the weekend with Jane Doe, defendant and his wife. While defendant's wife was away, defendant touched [Toni A.'s] vagina, breasts and butt with his hand and penis. Defendant also put his penis and fingers in her vagina. Defendant threatened to hurt her sister if she told. On one occasion, she and Jane Doe were staying at defendant's house when she heard Jane Doe, who was alone with defendant, cry for help. Toni A. went inside and found Jane Doe crying.

Jane Doe's mother, Jane Doe's aunt and a detective testified regarding statements made to them by Jane Doe about the incidents. A pediatrician testified that he examined Jane Doe on 3 June 1992 and observed that her vagina appeared to be wider than usual for a child her age, and that he could not find a hymen. He testified that "if there was a hymen there originally, then in order for it to become as flattened and nonapparent as it was it would take repeated stretching and repeated penetration."

9

> Defendant testified and denied molesting Jane Doe. Defendant's wife testified that defendant shared a bed with her and that she would know if he got out of bed.

State v. Bell, 117 N.C. App. 732, 453 S.E.2d 877 (1995) (table). (Reproduced in J.A. 57-59).

Bell argues that none of the four conditions of the test in Waller were met in the present case.

We first must consider whether the prosecution advanced an interest justifying the courtroom closure. Courts cannot close a courtroom for the sole reason that a young victim of a sex crime will testify:

> A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim. Among the factors to be weighed are the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives.

Globe Newspaper Co., 457 U.S. at 608 (footnotes omitted). See also Davis v. Reynolds, 890 F.2d 1105, 1110 (10th Cir. 1989) ("Considerations of a victim's age and the nature of the offense involved support a closure only when they form part of a careful case-by-case analysis of each individual situation.").

In the instant case, the trial court knew before trial that the prosecution intended to elicit testimony from the minor witnesses that might be embarrassing. But the court made no attempt to determine, on a case-by-case basis, the necessity of closing the courtroom during the testimony of the minor witnesses. The court failed to inquire, for example, about the maturity and understanding of the prosecuting witness or about her willingness to testify. Moreover, the court made no inquiry about the other minor witnesses. Indeed, at trial, the prosecutrix, who was then 16 years old, directly answered the questions put before her, including those of a distressing nature. The trial court knew before trial that one of the minor witnesses was reluctant to discuss a physical examination. But the prosecutor never asked her about

10

this subject at trial. Because the trial court failed to inquire about the minor witnesses' ability to testify and failed to make relevant findings, we cannot conclude in this case that the government advanced an interest sufficient to justify closing the courtroom.

The second prong of the Waller test requires that the closure be only as broad as necessary to meet the interest at stake. The nonexistence of factual findings renders us unable to determine the importance of the interest at stake. Therefore, we cannot agree with the prosecutor that closure was sufficiently tailored to meet that interest. For instance, nothing in the record suggests that the trial court had information allowing it to decide whether it was necessary to close the courtroom during the testimony of just one of the minor witnesses or for all three.

Nor are we persuaded that the trial court satisfied the third prong, which requires that the trial court consider alternatives to closing the courtroom. Waller, 467 U.S. at 48. Nothing in the record suggests that the trial court considered any alternatives to closure.

The fourth prong requires that the trial court make findings adequate to support closing the courtroom. Waller, 467 U.S. at 48. The trial judge indicated that he was closing the courtroom during "testimony of an apparent delicate nature." J.A. 281. This fact alone is insufficient to warrant closure: "Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." Globe Newspaper Co., 457 U.S. at 606-07 (emphasis supplied). We conclude that there is a reasonable probability that the trial judge's statement was insufficient to satisfy the requirements of the Sixth Amendment.

The Supreme Court has consistently and clearly required that trial courts make specific, on-the-record findings in support of closure. See Press-Enterprise II, 478 U.S. at 13-14 ("proceedings cannot be closed unless specific, on the record findings are made" demonstrating that closure is essential and narrowly tailored); Waller, 467 U.S. at 45, 48 (findings must be adequate to support closure, and may not be "broad and general"); Press-Enterprise I, 464 U.S. at 510 (findings must be

11

sufficiently specific for appellate review); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 (1980) ("Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.") (plurality opinion).

The Fourth Circuit also has emphasized the necessity of findings that justify closure. See, e.g., In re South Carolina Press Ass'n, 946 F.2d 1037, 1040-44 (4th Cir. 1991) (relying upon Press-Enterprise I); In re Charlotte Observer, 882 F.2d 850, 852-56 (4th Cir. 1989) (closure order reversed because of lack of judicial findings); In re Knight Publ'g Co., 743 F.2d 231, 234-35 (4th Cir. 1984) ("If the district court believes it necessary to close the courtroom after hearing the objections [to closure], it must state its reasons on the record, supported by specific findings.").

In Waller, the trial judge closed the courtroom during a suppression hearing after ruling that some evidence was related to alleged offenders not yet on trial. 467 U.S. at 42. The state's proffer failed specifically to identify whose privacy rights would be violated, how those rights would be violated, and which portions of taped evidence would infringe other's rights. Id. at 48. The Supreme Court held that as a result the trial court's findings were "broad and general" and failed to satisfy the public trial guarantee of the Sixth Amendment. Id.

We decline to accept the State's invitation to search the record for facts supporting closure. Some of the concerns cited by the State--the age of the victims, the traumatic nature of the assaults, the distress of testifying--while understandable, are present when any young victim of sexual assault testifies in court. If a reviewing court relied upon these factors, it would, in effect, be adopting a rule permitting closure whenever a young victim of sexual assaults testifies. The Supreme Court has rejected such a rule. See Globe Newspaper Co., 457 U.S. at 607-08. We do not hold that such factors are irrelevant to a trial court considering a motion to close the courtroom. But the Sixth Amendment requires that consideration of these concerns be on the record and occur in the context of a case-by-case examination of the competing interests at stake. See Waller, 467 U.S. at 48; Press-Enterprise II, 478 U.S. at 13-14; In re Knight Publ'g Co., 743 F.2d at 234-35. Moreover, we may not rely on after-the-fact concerns particular to the present case, such as the prosecution's pretrial proffer

12

that a witness was reluctant to discuss her physical examination. Actually, the proffer was not apt because during the trial the prosecutor did not ask the witness to testify about the physical examination.

The requirement of specific, on-the-record findings is intended to give appellate courts a basis for determining the propriety of closure. See Press-Enterprise I, 464 U.S. at 510. This function is nullified if reviewing courts, on habeas appeal, must search the record to understand why the trial court closed the courtroom.

We do not consider that an affidavit, filed pursuant to 28 U.S.C.A. § 2245 (West 1994), providing findings of fact submitted to the district court by the Pitt County trial judge four years after trial conclusively justifies closure. Posttrial assertions "cannot satisfy the deficiencies in the trial court's record." Waller, 467 U.S. at 49 n.8. Even if we did consider the affidavit, it would be of little help. As the magistrate judge found, the trial judge's affidavit "says little more than he knew the child was young, the attacker was old, and the crimes alleged were heinous." J.A. 185. The district court paid scant heed to the affidavit.

Our holding is consistent with that of other courts of appeals that have considered the issue of closure. See English v. Artuz, 164 F.3d 105, 109 (2d Cir. 1998) (the trial court made insufficient findings when it concluded only that closure was warranted by "the totality of the evidence and in particular the sworn testimony of [a] witness."); Guzman v. Scully, 80 F.3d 772, 776 (2d Cir. 1996) ("conclusory" justifications are insufficient). In Davis v. Reynolds, 890 F.2d 1105 (10th Cir. 1989), the defendant was accused of raping a 16-year-old girl. Id. at 1107. Asserting that the victim's psychological and emotional condition warranted closure, the prosecution moved that the public be excluded from the courtroom during the victim's testimony. The trial court granted the prosecution's motion, citing only the girl's age. Id. at 1108-09. The Tenth Circuit held that Davis' right to an open trial was violated because the trial court failed to inquire into the factual basis for the government's assertions and because the court failed to make factual findings in support of closure. Id. at 1110. The Tenth Circuit went on to note that without specific findings except the victim's age, the trial court's order was "essentially equivalent to the blanket legislative closure rejected in Globe Newspaper." Id. at 1111.

13

The State argues that the Fifth and Eighth Circuits have found no Sixth Amendment violation where trial courts have closed courtrooms without detailed findings. See United States v. Osborne, 68 F.3d 94, 99 (5th Cir. 1995); United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994). In Osborne, the court upheld the closure on the facts presented, which included specific supporting details offered by the prosecutor at the time of the motion. 68 F.3d at 99. Nevertheless, the Fifth Circuit admonished courts to "take care to develop a record of the issues, and make detailed factual findings." Id. In another case, the Eighth Circuit upheld a closure on facts that it had gleaned from the record. Farmer, 32 F.3d at 371. Because the Supreme Court and this court have mandated that trial courts make specific, on-the-record findings in support of closure, we decline to follow this holding.

In Osborne, the Fifth Circuit also adopted a standard allowing a "partial closure" of trial proceedings upon a showing that there was a "`substantial reason' for the closure." 68 F.3d at 98-99 (citing other courts that have adopted the same standard). The Supreme Court, however, has never contemplated a less rigorous constitutional requirement for trial closures, and neither has the Fourth Circuit. We therefore adhere to the standard articulated by the Court in Waller. Moreover, the trial judge never articulated the basis of even a substantial reason for closure other than "testimony of an apparent delicate nature." J.A. 281.

V

In Waller, the Court explained that a "defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." 467 U.S. at 49. Relying on courts of appeal and state opinions, the Court emphasized that prejudice "must necessarily be implied." 467 U.S. at 49 n.9 (citations and internal quotation marks omitted).

Waller is among the few cases designated as an example of structural error. See Johnson v. United States, 520 U.S. 461, 469 (1997) (citing Waller). A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." 520 U.S. at 468 (internal quotation marks and citation omitted).

14

In Neder v. United States, 119 S. Ct. 1827 (1999), the Court again recognized that denial of the right to a public trial as depicted in Waller was a structural error and held that "[e]rrors of this type are so intrinsically harmful as to require automatic reversal (i.e., `affect substantial rights') without regard to their effect on the outcome." Such errors "defy analysis by harmless error standards." Id. at 1833 (citation and internal quotations omitted).

VI

Claims of ineffective assistance of counsel are mixed questions of law and fact, Strickland v. Washington, 466 U.S. 668, 698 (1984), reviewable de novo. Becton v. Barnett, 920 F.2d 1190, 1192 (4th Cir. 1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland, 466 U.S. at 686. An ineffective assistance claim has two components: counsel's performance must have been deficient, and the defendant must have been prejudiced by counsel's conduct. Id. at 687. The right to effective assistance of counsel extends to criminal defendants on their first appeal of right, and the same standards apply to counsel at trial and on appeal. See Evitts v. Lucey, 469 U.S. 387, 396 (1985).

In order to establish that counsel's performance was deficient, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. In order to make a fair assessment of attorney performance, a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." Id. at 689. Under the Strickland standard, therefore, counsel's competence is presumed, and "the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).

The particular error alleged by Bell is that his counsel failed to pursue his Sixth Amendment public trial claim on direct appeal. In mak-

15

ing such decisions, appellate counsel need not raise every colorable claim but may, instead, select the most promising issues for appeal. Jones v. Barnes, 463 U.S. 745, 752, 754 (1983). Nevertheless, when counsel fails to brief "significant and obvious" issues on appeal for no apparent reason, "while pursuing issues that were clearly and significantly weaker," the competence of counsel is called into question. Mayo v. Henderson, 13 F.2d 528, 533 (2d Cir. 1994); accord Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986). In Matire v. Wainwright, 811 F.2d 1430, 1438-39 (11th Cir. 1987), for example, the Eleventh Circuit found ineffective assistance of counsel when appellate counsel ignored "a substantial, meritorious Fifth Amendment issue" that was "obvious on the record" and on which trial counsel had expressly objected. Id. at 1438. Similarly, Bell's appellate counsel omitted to brief a significant meritorious issue that was obvious on the record and instead pursued issues that the appellate court found lacked merit. Cf. Gray, 800 F.2d at 646.

At the time of Bell's appellate counsel's conduct in late 1994 and early 1995, the mandate of the Supreme Court that trial courts make specific, on-the-record findings before closing a courtroom was well established. See, e.g., Press-Enterprise II, 478 U.S. at 13 (1985); Waller, 467 U.S. at 48 (1984); Press-Enterprise I, 464 U.S. at 510 (1984).

In addition, during the pendency of Bell's appeal, the North Carolina Court of Appeals relied upon Waller to reverse a rape and kidnaping conviction. State v. Jenkins, 115 N.C. App. 520, 525-26, 445 S.E.2d 622, 625 (1994). As in the instant case, the trial court in Jenkins had failed to make findings of fact supporting closure during the testimony of the prosecuting witness. Id. The Court of Appeals decided Jenkins in June 1994, five months after Bell was convicted and seven months before argument in his direct appeal. Bell's appellate counsel certainly would have been able to rely on Jenkins, even if it was handed down after she filed the appellate brief. See N.C. R. App. P. 27, 37 (allowing parties to file motions at any time before the case is called for oral argument).

As in Matire, the Sixth Amendment claim here was obvious on the record, which shows that trial counsel explicitly objected to the closure on the grounds that it would "impact" on his "client's constitu-

16

tional right to a public trial." J.A. 280-81. In view of the controlling Supreme Court and North Carolina precedent and the paucity of findings of fact made by the trial court, it was unreasonable of counsel to fail to argue the public trial claim on appeal.

The preliminary presumption that counsel was competent has been rebutted, and there is no evidence that counsel's failure to pursue the claim was sound strategy. The record provides no strategic explanation for appellate counsel's decision to drop the public trial claim. Bell's appellate counsel did not testify, nor did she supply an affidavit, that she made a tactical decision not to brief the public trial claim. Precedent bars us from "conjur[ing] up tactical decisions an attorney could have made, but plainly did not . . . . Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." Griffin v. Warden, 970 F.2d 1355, 1358-59 (4th Cir. 1992). We hold that Bell's appellate counsel provided assistance that fell outside "`the range of competence demanded of attorneys in criminal cases.'" Strickland, 466 U.S. at 687 (citation omitted).

The second component of an ineffective assistance claim is prejudice. Bell must prove that his counsel's unprofessional errors resulted in an unfair or unreliable proceeding. Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). Application of controlling precedent establishes that Bell's right to a public trial was violated. See supra Section IV. On direct appeal, Bell's counsel could have shown, but did not, that the violation of his Sixth Amendment right to a public trial was not amenable to harmless error analysis and instead required automatic reversal. See Neder, 119 S. Ct. at 1833; Waller, 467 U.S. at 49. Omission of the public trial claim from the appellate brief thereby rendered the proceeding unreliable. For this reason, we hold that Bell was prejudiced by appellate counsel's failure to pursue the public trial claim.

VII

We turn finally to the question of the appropriate remedy. Congress has directed federal courts to dispose of habeas petitions "as law and justice require." 28 U.S.C.A. § 2243 (West 1994). This provision grants courts wide latitude in affording habeas relief. See, e.g., Carafas v. LaVallee, 391 U.S. 234, 239 (1968) ("[The habeas stat-

17

ute's] mandate is broad with respect to the relief that may be granted.").

The Supreme Court has directed that the remedy should be appropriate to the Sixth Amendment violation. See Waller, 467 U.S. at 50. The Court has also counseled that in the habeas context, state courts should be given an opportunity to remedy errors that occurred at the state level. See, e.g., Hilton v. Braunskill, 481 U.S. 770, 775 (1987). We direct that the writ should issue and Bell be released, unless North Carolina elects to afford him within 180 days a new appeal or a new trial. Accord Mayo, 13 F.3d at 537.

REVERSED AND REMANDED

TRAXLER, Circuit Judge, dissenting:

With respect, I dissent. In this case, Wendy was called upon to testify that Bell, her 58-year-old step-grandfather, sexually molested her by vaginal and anal intercourse, oral sex, and other indecent sexual touchings, approximately twice a week for two years, beginning when she was 12 years old. The state trial judge, presented with indictments comprised of over 80 counts of alleged sexual misconduct by Bell towards Wendy, conducted a pre-trial hearing, during which he was made aware of the heinous nature of the alleged crimes, the child's long silence, and her forecasted testimony. He concluded that temporarily closing the courtroom during Wendy's difficult testimony would be appropriate. His concern was justified; her testimony was lurid.

The Supreme Court has specifically recognized that trial judges may, in their discretion, exclude the press and general public from the courtroom during the testimony of a child victim of a sexual crime, without running afoul of a defendant's Sixth Amendment right to a public trial, so long as such closure orders are made on a "case-by-case basis." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 608 (1982). However, unlike the majority, I do not believe that trial courts are required to state the obvious in order for us to "determine whether [a] closure order was properly entered," Waller v. Georgia, 467 U.S. 39, 45 (1984) (internal quotation marks omitted), or that the absence of explicit findings mandates a presumption on our part that

18

the state trial court did not consider the individual circumstances of the case before it. Requiring us to evaluate the closure based solely on explicit findings by the trial court, even where the record readily supports the result, places form over substance and, here at least, results in federal habeas relief for a defendant who has obviously not been deprived of his Sixth Amendment right to a public trial. Accordingly, were de novo review appropriate in this case, I would not hold that Bell's Sixth Amendment right to a public trial was violated, nor would I deem Bell's appellate counsel deficient for not arguing the public trial claim on direct appeal.

Of course, our standard of review is not de novo. The crux of my dissent, therefore, lies not in how I or other members of this court would resolve the matter on de novo review, but in the recognition that we are not empowered to do so. Rather, we are limited to a determination of whether the North Carolina court has rendered a "decision that [is] contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West Supp. 1998); see Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998) (holding that writ may not issue unless, "after an independent review of the applicable law," we conclude that the state court decision was contrary to or involved an unreasonable application of those legal principles).

Accordingly, our precedents are helpful, but not dispositive. And, the relevant inquiry is not whether "there is a reasonable probability that the trial judge's statement was insufficient to satisfy the requirements of the Sixth Amendment," Majority Op. at 11, or whether we should decline to follow, as the majority has done, the holdings of other circuits which have approved of a limited or temporary closure in the absence of detailed findings if sufficient support for the closure can be gleaned from the record. Instead, the question is whether in light of these precedents we can really say that the decision of the North Carolina court was an unreasonable application of clearly established federal law. Because other circuits have applied Supreme Court precedent in a manner consistent with North Carolina's denial of Bell's Sixth Amendment claim, and in a manner which I find to be reasonable, I cannot conclude that North Carolina's denial of Bell's claim was an unreasonable application of clearly established

19

federal law and would affirm the district court's denial of habeas relief.

I.

In order to determine whether North Carolina's denial of Bell's claim is contrary to or involves an unreasonable application of clearly established federal law, I begin with a recitation of the facts as they were presented at the state trial court level.

In January 1994, Bell was convicted of 58 counts of sexual misconduct committed against his minor step-granddaughter Wendy -- 8 counts of first degree rape, 4 counts of first degree sexual offense, 19 counts of second degree rape, and 27 counts of taking indecent liberties with a minor.[1] The offenses spanned a two-year period, beginning in March 1990, when Wendy was awakened on a Saturday morning by Bell, who proceeded to rape her while she begged him to stop. Afterwards, Bell told Wendy that he would stop loving her if she told anyone what he had done. Wendy was 12 years old and in the sixth grade. Bell was 55 years old, a family member and trusted adult figure in Wendy's life, known to her since birth.

The threat was effective. For the next two years, Bell, who lived nearby, molested Wendy once or twice each month in his home, while his wife was sleeping or at work, and approximately twice a week at Wendy's home, and in her bed, during her after-school hours. Wendy, too frightened to tell her parents about the abuse, began to withdraw from others and to sleep on the floor instead of in her bed. In addition, Wendy's schoolwork, already made difficult by her learning disability, began to deteriorate.

Evidence at trial revealed that, in addition to Wendy, Bell had sexually molested two other adolescent girls, both of whom lived nearby and were friends of Wendy. The first, Toni, testified that Bell had repeatedly molested her by vaginal and anal intercourse, over the course of approximately one year, and that Bell utilized threats of hurting her sister to keep her from telling anyone. Toni also testified

_____

[1] The record indicates that 27 additional counts were dismissed during the course of the trial.

20

that she was present at Bell's home on one occasion when he sexually molested Wendy. Locked outside of the house, Toni testified that she could overhear Wendy's screams. Toni was 11 years old when the abuse began.

The third minor, Vicki, testified that while visiting Bell with Wendy in the fall of 1990, Bell touched her breasts, anus, and vagina through her clothing. At the time, Bell's wife was cooking dinner and Vicki, unsure of what had occurred, got up from the floor where she had been playing with a puppy and sat on the couch. The next day, Vicki asked Wendy if Bell had done anything like this to her, prompting Wendy to confide in her young friend. At the time, Vicki was 12 years old. Afterwards, Wendy continued to confide in Vicki about Bell's actions, but Vicki kept silent. She also refused Wendy's requests that Vicki go with her to Bell's home. In May 1992, however, Vicki finally agreed to again accompany Wendy to Bell's home, hoping Bell would leave Wendy alone if Vicki was present. Instead, Bell turned his attention to Vicki. While Bell's wife and Wendy slept, Bell again touched Vicki in the same places, although this time he did so beneath her clothing. Vicki was able to temporarily avoid further assault, first by telling Bell she needed to go to the restroom, and later by the stirrings of Bell's sleeping wife. Undaunted, Bell repeated these actions the following day, while swimming with Vicki and Wendy. Like her friends, Vicki continued her silence.

In fact, each of the girls kept quiet until June 1992, when Wendy and Vicki attended a slumber party together and saw a television show about rape and the sexual molestation of children. Vicki told Wendy that she "couldn't take it anymore, [and] was telling [her] parents the next day when [she] got home." J.A. 451. Wendy agreed to do the same. The following afternoon, Wendy told her mother and aunt about Bell's sexual abuse, and law enforcement officers were contacted. Shortly thereafter, Wendy was examined by a pediatrician who found physical evidence consistent with repeated sexual penetration.

The day before Bell's trial began, the state trial judge held a pretrial hearing to address several evidentiary issues, Bell's motion to sequester the minor witnesses, which was granted, and the state's motion to consolidate the charges involving Wendy with those

21

involving Toni and Vicki, which was denied. The state also moved to close the courtroom during the testimony of each girl, but at least as to Wendy. Bell objected, on Sixth Amendment public trial grounds, but offered no alternative to the temporary closure request proposed by the state. The trial judge, noting that the testimony would be "of an apparent delicate nature," J.A. 281, agreed that a temporary closure would be appropriate, but ruled that it would be carried out as discreetly as possible so as not to call it to the jury's attention.

The next day, the courtroom was closed to the public during Wendy's testimony.[2] At a minimum, however, the court reporter, court personnel, the jury, the prosecutor, Bell's attorney, and the family members and friends of the minor witnesses were allowed to remain.[3] Also, a transcript of the testimony was taken and available to the public. Of the 700-plus page trial transcript, approximately 44 pages comprise the testimony of Wendy.

At the conclusion of Wendy's testimony, the courtroom was immediately reopened.[4] At that time, the trial court specifically inquired as

_____

[2] Before the jury entered the courtroom, the state informed the judge that Wendy would be the first witness. This resulted in the closure being implemented for a short time before Wendy actually testified -- specifically, during the swearing of the jury and the very brief openings, all of which comprised five pages of transcript. By doing so, the trial judge eliminated the need to return the jury to the jury room after openings and served the goal of carrying out the closure as discreetly as possible. Although technically beyond the scope of the original closure order, Bell's trial counsel lodged no objection to the closure being handled in this manner.

[3] The state contends that the press was permitted to stay, but Bell contends that this is unclear. It is indeed unclear. The transcript does not indicate whether the press was present in the courtroom or whether any member of the press wanted to be present. Although there was pre-trial publicity associated with the trial, there is no indication that the press objected to the closure.

[4] Although the state originally asked for closure of the courtroom during the testimony of Toni and Vicki, it is also unclear as to whether the courtroom was ever closed again -- a fact which the majority and Bell do not dispute. Bell's petition for habeas relief complains that "the trial

22

to whether Bell wanted his wife to return to the courtroom. Bell's counsel refused, indicating that they did <u>not</u> want her to return, after which the trial judge stressed that Bell was entitled to have anyone he wanted in the courtroom with him.**5**

Bell was ultimately convicted by the jury and sentenced to two life terms plus seventy years. On direct appeal, counsel selected six assignments of error to pursue. The convictions and sentence were affirmed on direct appeal and Bell's state application for post-conviction relief was subsequently dismissed.

II.

In his federal habeas petition, Bell raises the sole claim that he received ineffective assistance of counsel on direct appeal, in viola-

_____

judge closed the courtroom during the complainant's testimony," J.A. 92, and, in any event, if Bell cannot show that the courtroom was closed during the testimony of Toni and Vicki, he obviously cannot show a violation of his right to a public trial on that basis. Accordingly, my discussion is limited to the closure of the courtroom during Wendy's testimony. However, even if Bell had shown that the courtroom was closed during the testimony of the other two girls, my opinion would be the same. When the trial judge granted the motion to close the courtroom, he also possessed substantial information about Bell's alleged assaults upon them.

**5** With the exception of his wife, Bell points to no one who was actually excluded by the trial court's order. The specific colloquy regarding her return was as follows:

> THE COURT: All right.
> Do you want Mrs. Bell to come in here?
>
> MR. O'KELLEY: Your Honor, I don't actually. We'll just leave her out of the courtroom, that will be fine.
>
> THE COURT: Well, you are welcome to have anybody in here you want now.
>
> MR. O'KELLEY: Yes, sir, I understand.

J.A. 339.

23

tion of his Sixth Amendment right to counsel, because his appellate counsel did not pursue a claim that his Sixth Amendment right to a public trial was violated by the trial court's temporary closure of the courtroom during Wendy's testimony. The state court reasonably rejected this claim, and we should as well.

In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, Bell must show that (1) his "counsel's representation fell below an objective standard of reasonableness" in light of the prevailing professional norms, Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. In applying this test, we accord appellate counsel the "presumption that [they] decided which issues were most likely to afford relief on appeal." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). We do not obligate counsel to assert all non-frivolous issues on appeal. Rather, "`[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appellate advocacy.'" Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989) (quoting Smith v. Murray, 477 U.S. 527, 536 (1986)).

Also, we do not review Bell's claim de novo. Because Bell's claim was adjudicated on the merits by the North Carolina state court, our review is limited by section 2254(d), under which we may not grant federal habeas relief unless, after conducting an independent review of the law and facts, see Wright, 151 F.3d at 157, we conclude that North Carolina's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A. § 2254(d)(1). Under section 2254(d)(1), federal habeas relief is authorized only when the "state court decision is in square conflict with a precedent (supreme court) which is controlling as to law and fact." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999). In the absence of such a controlling precedent, the applicant must demonstrate that "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or . . . upon an objectively unreasonable application

of established principles to new facts." Id. In essence, "habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Id.

Accordingly, Bell must clear a high hurdle to obtain federal habeas relief. He must establish that North Carolina's rejection of his ineffective assistance of counsel claim in state post-conviction proceedings was directly contrary to controlling Supreme Court precedent or involved an unreasonable application of such precedent. In my opinion, Bell has not met this burden.

Bell's sole contention is that counsel on direct appeal was ineffective for failing to argue that Bell's Sixth Amendment right to a public trial was violated by the trial court's temporary closure of the courtroom during Wendy's testimony. Having made an independent review of the law and facts, I agree with the district court's conclusion that Bell's appellate counsel was not ineffective. At a minimum, the relevant public trial precedents reveal that reasonable jurists can disagree, and indeed have disagreed, on whether existing Supreme Court precedent dictates the conclusion that the public trial right has been violated under similar circumstances. Accordingly, I believe that North Carolina could have reasonably concluded that Bell's appellate counsel's representation did not fall below an objective standard of reasonableness simply because counsel did not pursue, on direct appeal, a claim that Bell's right to a public trial was violated by the temporary closure. And, of course, a determination that Bell's right to a public trial was not violated would compel the conclusion that there was no reasonable probability that the outcome of Bell's appeal would have been different even if counsel had raised the claim. For these reasons, I believe that section 2254(d) commands that we deny Bell federal habeas relief.

III.

The Sixth Amendment provides that an individual accused of a criminal offense has "the right to a speedy and public trial." U.S. Const. amend. VI; see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 574 (1980). Finding its roots in English common law, "the guarantee has always been recognized as a safeguard against any

25

attempt to employ our courts as instruments of persecution." In re Oliver, 333 U.S. 257, 270 (1948).**6** Today, the right remains grounded in the belief that "`judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings,'" Waller v. Georgia, 467 U.S. 39, 46 n.4 (1984) (quoting Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)), and that "`the forum of public opinion is an effective restraint on possible abuse of judicial power,'" id. (quoting In re Oliver, 333 U.S. at 270). "The central aim of a criminal proceeding [is] to try the accused fairly" and the public trial guarantee serves the purpose of "ensuring that judge and prosecutor carry out their duties responsibly . . ., encourag[ing] witnesses to come forward[,] and discourag[ing] perjury." Id. at 46.

In light of these general principles, the Supreme Court has held that there is a presumption in favor of open trials. Yet the right is not absolute, and trial judges have discretion to impose reasonable limitations on access to a trial where overriding interests are likely to go unprotected if closure is not employed. See Waller, 467 U.S. at 45. Specifically, in the context of a Sixth Amendment challenge to the complete closure of a courtroom, the defendant's right to a public trial may give way if:

> (1) the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced,
>
> (2) the closure is no broader than necessary to protect that interest,
>
> (3) reasonable alternatives to closing the proceeding are considered by the trial court, and
>
> (4) findings adequate to support the closure are made by the trial court.

_____

**6** The origin of the "traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet." In re Oliver, 333 U.S. 257, 268-69 (1948) (internal footnotes omitted).

26

See Waller, 467 U.S. at 48.

The magistrate judge and district judge agreed that the temporary closure in this case complied with Waller's first three requirements, but disagreed as to whether the trial court's findings were adequate, i.e., whether there were "'findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" Id. at 45 (quoting Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984)). The majority, on the other hand, has concluded that the temporary closure satisfied no requirement of the Waller test. Accordingly, I address each factor in turn, keeping in mind, of course, that I do so only to determine whether the state court's determination was an unreasonable one.

A.

The initial inquiry is whether the state advanced an overriding interest justifying a temporary closure of the courtroom. I have no hesitancy in concluding that this requirement was met.

1.

Initially, I note that the majority appears to unnecessarily place our circuit at odds with others that have relaxed the Waller requirements where a temporary or partial closure of a proceeding is at issue. Specifically, these circuits have required only that the state advance a "substantial reason" for closing the proceeding because, unlike those situations involving a complete closure, a partial closure does not threaten as acutely the historical concerns sought to be addressed by the Sixth Amendment. See United States v. Osborne, 68 F.3d 94, 98-99 (5th Cir. 1995); United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994); United States v. Sherlock, 962 F.2d 1349, 1356-57 (9th Cir. 1992); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir. 1989); Douglas v. Wainwright, 739 F.2d 531, 532-33 (11th Cir. 1984) (per curiam). Similarly, where a partial closure is involved, courts have "'look[ed] to the particular circumstances to see if the defendant still received the safeguards of the public trial guarantee.'" Sherlock, 962 F.2d at 1357 (quoting Douglas, 739 F.2d at 532).

27

The majority has rejected the reasoning of these circuits, opining that because the Supreme Court has never set forth a less rigorous standard for partial closures, we should also decline to do so. However, neither the Supreme Court nor this court has been required to consider whether Waller's stringent test for complete closures applies equally in the context of a temporary or partial closure such as that before us today. Therefore, I would not so readily dismiss the opinions of our sister circuits, particularly when it is unnecessary to either embrace or reject them. Whether treated as a complete or partial closure, I believe the trial judge's temporary closure of the courtroom during Wendy's testimony advanced a compelling interest.

2.

The state obviously had a compelling interest in protecting Wendy from further emotional trauma, including minimizing the humiliation associated with relating the details of Bell's vile behavior in open court. In Globe, the Supreme Court rejected, on First Amendment grounds, a Massachusetts statute which required trial judges to close the courtroom during the testimony of minor victims of specified sexual offenses, but made clear that "safeguarding the physical and psychological well-being of a minor" victim of sex crimes, including protecting them from further trauma and embarrassment, is precisely the type of compelling interest which can overcome the presumption in favor of an open trial. 457 U.S. at 607. Thus, closing the courtroom is appropriate, provided the trial court "determine[s] on a case-by-case basis [that] the State's legitimate concern for the well-being of the minor victim necessitates closure," id. at 609, taking into account such factors as "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives," id. at 608.[7] See also Press-

_____

[7] The Court took care to explicitly point out the limited nature of its holding:

> We emphasize that our holding is a narrow one: that a rule of mandatory closure respecting the testimony of minor sex victims is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims. But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional.

Globe, 457 U.S. at 611, n. 27.

28

Enterprise Co. v. Superior Court, 478 U.S. 1, 9 n.2 (1986) ("The protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding.").

The majority concludes that the first requirement of Waller was unsatisfied because the trial court did not make a case-by-case determination and, instead, applied a per se rule of closure of the type condemned in Globe. In particular, the majority faults the trial court for not directly inquiring about the maturity, understanding, and willingness of the victim to testify.**8**

While Globe does set forth factors which a trial court should consider when determining the propriety of closing a courtroom during the testimony of a minor, sex crime victim, the Court did not prescribe any that were determinative and, in fact, recognized that trial courts would necessarily need to exercise discretion in weighing these factors, as well as others not yet defined. I have no basis upon which to conclude that the state trial judge failed to carefully consider the individual facts of this case before making his decision, or that he otherwise shirked his duty in this regard. On the contrary, when the trial judge granted the state's motion for a temporary closure, North Carolina state law provided that "[i]n the trial of cases for rape or sex offense . . ., the trial judge may, during the taking of the testimony of the prosecutrix, exclude from the courtroom all persons except the officers of the court, the defendant and those engaged in the trial of the case." N.C. Gen. Stat. § 15-166 (1983) (emphasis added). Hence, unlike the statute in Globe, North Carolina imposed no per se rule of closure. Rather, the trial judge was vested with the discretion to evaluate the propriety of a temporary closure. And he clearly possessed

_____

**8** Actually, the majority's conclusion appears to rest upon the absence of explicit factual findings in this regard, rather than upon a determination that no compelling interest was at stake or that temporary closure of the courtroom was not the least restrictive means of serving a compelling interest. Indeed, the majority expressly concludes that, due to insufficient findings, the second requirement of Waller was also not met. Thus, at the outset, I disagree with the majority's implicit engrafting of the fourth Waller requirement upon the other three, thereby rendering the lack of detailed factual findings outcome-determinative.

29

knowledge sufficient to exercise this discretion. Prior to ruling on the state's motion to close the courtroom, the trial judge had substantial information before him disclosing the number of the charged crimes, the heinous nature of the crimes, the age of the victim, the long duration of her silence, and her expected testimony. With this knowledge, the trial court made the quite reasonable determination that a temporary and discrete closure was appropriate. The graphic nature of Wendy's ultimate testimony only serves to bolster my conclusion that the trial judge followed an acceptable, indeed proper, course in temporarily closing the courtroom.**9**

Thus, I agree with the district court's determination that the state demonstrated an overriding interest in protecting a child victim of multiple rapes and sexual molestation by a family member and that the first Waller requirement was met. Indeed, if the facts underlying this case are insufficient to establish an "overriding interest," I can think of none.

B.

For similar reasons, I cannot agree that the temporary closure failed to meet Waller's requirement that a closure be no broader than necessary to protect the interest at stake. Because the compelling interest for closing the courtroom was the protection of Wendy during her testimony, limiting the closure to her testimony was imminently tailored to serve that interest. Additionally, the courtroom was not unnecessarily restricted. Court personnel, the attorneys, and the court reporter remained and, of course, the jury, comprised of the public, was present. The entire proceedings were recorded, the recorded transcript was made available to the public, and there is no claim that anything occurred which is not reflected in the transcript. See Ayala v. Speckard, 131 F.3d 62, 72 (2d Cir. 1997) (en banc), cert. den., 118 S.Ct. 2380 (1998) (noting availability of transcript as a consideration

_____

**9** The majority appears to place some reliance upon the fact that Wendy, "who was then 16 years old, directly answered the questions put before her, including those of a distressing nature." Majority Op. at 10. Of course, it was necessary for Wendy to do so in order for the state to convict Bell. But the transcript certainly does not indicate that Wendy did so stress-free.

30

in deciding whether a limited closure designed to protect a single witness during his testimony was violative of the Sixth Amendment right to a public trial); cf. Press-Enterprise, 464 U.S. at 512 (noting, as a consideration in a First Amendment challenge to the limited closure of jury voir dire, that "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests").

Obviously, this was not a situation where the purposes behind the public trial guarantee were in jeopardy. Bell was not subjected to a "secret trial" or to the "persecution" sought to be prevented by the public trial guarantee, nor does he contend that he has been. Rather, the limited and temporary nature of the closure was fully consistent with protecting Wendy during her testimony. Accordingly, I am satisfied that the closure was properly limited and narrowly tailored to achieve the intended purpose of protecting this young girl while she was being asked to discuss the details of Bell's repeated sexual assaults upon her.

C.

Next, Waller provides that trial courts are to consider reasonable alternatives to closing the courtroom. I likewise find no deficiency in this regard.

First, I cannot conclude that the trial judge failed to consider any alternatives to the one proposed by the state simply because he did not discuss them in open court. Rather, the limited nature of the closure directed by the trial judge, and his concern that it be carried out in the most discreet way possible, suggests that he did consider the situation and determine the most appropriate means to balance the goal of protecting Wendy with Bell's constitutional right to a public trial.

Second, even had the trial judge not considered alternatives, I cannot conclude that this rendered his decision violative of Bell's right to a public trial. In response to the state's motion for a temporary closure, Bell's counsel objected on the basis of the Sixth Amendment public trial provision but provided nothing in the way of argument.

31

Once the trial judge determined that the interest in protecting Wendy outweighed Bell's interest in an open courtroom, Bell again proposed no alternative to the limited closure.**10** <u>Waller</u> does not, in my opinion, require trial courts to invent and reject alternatives to a temporary or partial courtroom closure where none are requested. The closure extended only to the testimony of a single witness for her protection, and it would seem utterly pointless to require the trial judge to conjure up alternative methods of protecting the witness only to reject his own proposals. Obviously, the trial judge is not in a superior position to suggest alternatives which may be more acceptable to the defendant and his counsel.

Finally, I am not alone in my belief that the trial judge's failure to articulate alternatives is not fatal to the propriety of the closure. In <u>Ayala</u>, the Second Circuit, sitting <u>en banc</u>, held "that once a trial judge has determined that limited closure [to protect a single witness during his testimony] is warranted as an alternative to complete closure, the judge [need not] <u>sua sponte</u> consider further alternatives to the alternative deemed appropriate." 131 F.3d at 71. At a minimum, reasonable jurists could conclude that the failure to articulate alternatives to the limited closure did not transform the closure into a violation of Bell's constitutional right to a public trial, and I cannot conclude that North Carolina was unreasonable in its adjudication of Bell's claim on this basis.

D.

Finally, <u>Waller</u> requires trial courts to make factual "findings adequate to support the closure." <u>Waller</u>, 467 U.S. at 48. Like the district court, I believe it reasonable to conclude that the temporary closure of Bell's trial did not fall short of this requirement.

_____

**10** Bell now asserts that possible alternatives included allowing the press to remain, using a screen or privacy device to block Wendy's view of the audience, or using a closed-circuit television. Of course, Bell did not propose these alternatives at trial. Also, the latter two alternatives would not serve the purpose of carrying out the closure in a discreet manner and, again, it is far from clear that the press was excluded.

32

In Waller, the Court addressed the propriety of the complete closure of a 7-day hearing, held to address the admissibility of wiretap and other evidence in a proceeding brought under the Georgia Racketeer Influenced and Corrupt Organizations Act and other commercial gambling statutes. Although the stated basis for the closure was to protect the privacy of non-parties and the admissibility of the evidence under state law, the evidence sought to be protected comprised less than 2 hours of tape and the state was not specific as to whose privacy interests might be infringed. Thus, the trial court's findings were deemed too broad and general to justify a complete closure of the hearing. See id. at 48-49.

In determining whether the defendants' Sixth Amendment right to a public trial had been violated, the Waller Court applied the tests previously developed for First Amendment challenges to courtroom closures and, in doing so, set forth a requirement that the trial court "make findings adequate to support the closure." Id. at 48. Our circuit, also in the context of First Amendment challenges to complete courtroom closures, has reiterated this requirement. See In re South Carolina Press Ass'n, 946 F.2d 1037, 1041 (4th Cir. 1991) (instructing that we apply a three-prong test for determining the propriety of closing a courtroom, provided the district court has made specific judicial findings on each of the three prongs); In re Charlotte Observer, 882 F.2d 850, 853 (4th Cir. 1989) (noting that "[w]e have required such specific reasons and findings on the record to facilitate the de novo review of such closure orders"); In re Knight Publ'g Co., 743 F.2d 231, 235 (4th Cir. 1984) (explaining that "[t]he court's findings must be specific enough to enable a reviewing court to determine whether the closure order was proper").

By holding, in effect, that the Sixth Amendment right to a public trial hinges upon the sufficiency of the trial court's findings, even where a partial or temporary closure has been ordered for quite obvious reasons, I believe the majority has placed undue emphasis upon Waller's requirement that the trial judge "make findings adequate to support the closure." Waller, 467 U.S. at 48. Waller prescribed no particular format to which a trial judge must adhere to satisfy its adequate findings requirement. Rather, the Court's reference to the need for adequate findings stems directly from its previous recognition that trial courts need to make "findings specific enough that a reviewing

33

court can determine whether the closure order was properly entered." Id. at 45 (internal quotation marks omitted). In this case, I am able to do so, and I read nothing in Waller which would require me to review the state trial court's closure order solely on the basis of its explicit factual findings and, thereby, ignore facts of record which fully support the decision. Furthermore, neither Waller nor our cases addressed a temporary closure of courtroom proceedings during the testimony of a minor victim of sexual molestation, which would surely require findings different from those necessary to review a complete closure.

Two other Circuit Courts of Appeal would appear to agree that a Sixth Amendment violation does not occur, when a partial or temporary closure is involved, merely because the trial court fails to make detailed and explicit findings to support the exercise of his discretion. In United States v. Farmer, 32 F.3d 369 (8th Cir. 1994), which involved the aggravated sexual abuse and kidnapping of a 17-year-old girl, the trial court excluded all spectators other than the members of the victim's family during a portion of the victim's testimony. Although recognizing the lack of "explicit findings" by the trial court, the Eighth Circuit noted that, unlike the complete closure at issue in Waller, it was faced with a partial closure which did not "`implicate the same secrecy and fairness concerns that a total closure does,'" id. at 371 (quoting Woods v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1992), and rejected defendant's Sixth Amendment public trial challenge on direct appeal because "specific findings by the district court are not necessary if we can glean sufficient support for a partial temporary closure from the record," id. at 371.

The Fifth Circuit endorsed a similar approach in United States v. Osborne, 68 F.3d 94 (5th Cir. 1995), in which the trial court partially closed the courtroom while a 12-year-old victim of sexual assault testified. Despite the paucity of the trial court's explicit findings, the court rejected the defendant's Sixth Amendment public trial challenge because it was able to "infer that [the trial court] eventually ordered the partial closure" to protect the young victim from the trauma and intimidation that her public testimony would produce. Id. at 99. Hence, the Fifth Circuit, while admonishing trial courts to "take care to develop a record of the issues, and make detailed factual findings," was also unwilling to place form over substance when there was in fact no violation of the defendant's right to a public trial. Id.; see also

34

Brown v. Kuhlmann, 142 F.3d 529, 538 (2d Cir. 1998) (refusing to grant habeas relief for an alleged Sixth Amendment public trial violation, holding that even where the reasons given are "neither entirely accurate nor particularly compelling, the strength of the judge's findings must be evaluated by reference to the very limited scope of the closure that they support [and that] by that standard, the trial court's findings were adequate"); Woods v. Kuhlmann , 977 F.2d 74, 77-78 (2d Cir. 1992) (holding that, despite the lack of specific findings of fact, where the "information gleaned [from the record] . . . [was] sufficient to support the partial, temporary closure of petitioner's trial," the fourth Waller factor was satisfied).

Before ruling on the motion to close the courtroom, the trial judge in this case was aware of the nature of the charges before him, including the extraordinary number of counts and the span of time over which they were committed, the age of the victim, and the defendant's familial relationship to the victim. Specifically, he was aware that Bell had been indicted for over 80 counts of sexual misconduct, including multiple counts for first degree statutory rape of a minor under the age of 13, second degree rape, and taking indecent liberties with a minor. During the pre-trial hearing, he had the opportunity to become familiar with the graphic nature of the allegations and to observe the minor witnesses, as well as Bell, in the courtroom. He was made aware that the case involved the alleged sexual molestation of three minor children, and that the principal victim was the minor step-granddaughter of the 58-year-old defendant, who starting at age 12 suffered multiple instances of sexual abuse over a two-year period. He was aware that Bell's victims were friends with one another, neighbors of Bell and his wife, and that on at least one occasion, one of the girls was present at Bell's home while Wendy was being molested. He had also been provided, in the context of the state's motion to consolidate the offenses, with a summary of when and how the abuse occurred, including the repeated sexual abuse of both Wendy and Toni. Additionally, the trial judge was aware that Wendy had kept quiet about the abuse from the time that she was 12 years old until, two years later, she and Vicki were prompted to come forward by the television show on child molestation and rape. Also, when the courtroom was closed, the trial judge was aware that Wendy's performance at school was lagging significantly.

35

Accordingly, the trial judge's order that the courtroom be tempo-rarily closed during Wendy's testimony was obviously not a per se closure made in isolation of the particular facts before him. The trial judge possessed substantial information which enabled him to evalu-ate and determine, on a case-specific basis, that temporary closure was appropriate. And he was certainly correct when he concluded that the delicate nature of the testimony was "apparent."

Furthermore, written, detailed findings that Wendy's testimony would be embarrassing or humiliating are unnecessary for us to deter-mine that closure of the courtroom was an appropriate exercise of the trial judge's discretion. Supreme Court precedents do not require trial courts to recite exhaustively every fact and inference which justifies the obvious, nor do they command that we review closure orders in isolation of the record. Indeed, this court has previously declined, in the context of a section 2254 petition, to place such undue emphasis on the explicit findings made by a state trial court where the facts of record supported the trial court's challenged ruling. See Fields v. Murray, 49 F.3d 1024, 1036-37 (4th Cir. 1995) (en banc).

In Fields, the state court defendant alleged that his Sixth Amend-ment right to self-representation had been violated by the state trial judge's refusal to allow him to personally cross-examine minor vic-tims of his alleged sexual abuse. Noting that the state's interest in pro-tecting child abuse victims from emotional trauma was sufficiently important to outweigh the defendant's right to cross-examine them personally, we declined to find a Sixth Amendment violation simply because the trial court failed to make "a more elaborate finding," id. at 1036, to support his decision where sufficient support was present in the record:

> We think it reasonable for the trial court to have concluded
> on the basis of the facts before it that the[ ] eleven through
> thirteen-year-old girls who had experienced repeated sexual
> abuse would be emotionally harmed if they were personally
> cross-examined in open court by [defendant], their alleged
> abuser. We therefore find adequate the trial court's determi-
> nation that denial of this personal cross-examination was
> necessary to prevent emotional trauma to the girls.

36

Id. at 1036; cf. Arizona v. Washington, 434 U.S. 497, 517 (1978) (when "[t]he basis for the [state] trial judge's mistrial order [was] adequately disclosed by the record," habeas relief was not warranted by the court's failure "to articulate on the record all the factors which informed the deliberate exercise of his discretion"). The record and factual findings underlying the state trial judge's decision to close the courtroom during Wendy's testimony are sufficient for me to determine that the closure order was properly entered, and therefore, I cannot conclude that the state court unreasonably rejected Bell's claim that the temporary closure, or the limited nature of the trial court's findings, violated his Sixth Amendment right to a public trial.**11**

IV.

Having independently reviewed the applicable precedents, I turn now to the ultimate issue before us: whether North Carolina's rejection of Bell's claim was the result of an unreasonable application of those precedents. The majority, while initially acknowledging this limited standard of review, makes little reference to it in rendering its ultimate determination that habeas relief is appropriate, concluding instead "that there is a reasonable probability that the trial judge's statement was insufficient to satisfy the requirements of the Sixth Amendment," Majority Op. at 11, and that we should decline to follow the holdings of those circuits which have applied Waller in a manner consistent with my views and with North Carolina's rejection of Bell's post-conviction claim. Yet this is not our ultimate task.

_____

**11** I recognize, of course, that the Tenth Circuit found a public trial violation in a case involving a minor sex crime victim, in large part because the trial judge made no "specific, reviewable findings adequate to support the general closure." Davis v. Reynolds, 890 F.2d 1105, 1112 (10th Cir. 1989). In so ruling, the court appears to have drawn no distinction between the findings necessary to justify the complete closure of the 7-day suppression hearing in Waller and those necessary to justify temporary closure of a courtroom while the minor victim of a sex crime testifies. But, in any event, any difference of opinion on this point merely highlights the fact that reasonable jurists can disagree on the proper application of Supreme Court precedent in this type of case and, therefore, that the AEDPA amendments to section 2254(d) would now preclude federal habeas relief.

North Carolina rejected Bell's claim that his appellate counsel was ineffective for failing to argue, on direct appeal, that his right to a public trial was violated by the temporary closure of the courtroom during Wendy's testimony.**12** At a minimum, reasonable jurists can and have disagreed as to how Waller should be applied to a temporary courtroom closure such as this. Because North Carolina's determination is neither contrary to nor an unreasonable application of clearly established federal law, see 28 U.S.C.A. § 2254(d), I would affirm the district court's denial of Bell's habeas petition.

_____

**12** In concluding otherwise, the majority has in part relied upon State v. Jenkins, 445 S.E.2d 622, 625 (N.C. App. 1994), decided after Bell's conviction but before his appeal, which held that the trial court erred in closing the courtroom during the testimony of an adult victim of a sexual offense without making sufficient findings in support. The facts, which involved an adult woman alleged to have been raped by her former live-in boyfriend, are distinguishable from the ones we consider today, and Jenkins obviously had no effect upon the state appellate court's subsequent disposition of Bell's application for post-conviction relief. Furthermore, the question before us is whether North Carolina's rejection of Bell's claim is unreasonable in light of Supreme Court precedent, not whether the state court properly applied its own precedent.

38